# SERVICE ROAD CORPORATION ET AL. *v.* DANIEL QUINN ET AL.

## (SC 15506)
## (SC 15607)

Callahan, C. J., and Borden, Berdon, Katz and Peters, Js.

Argued April 23—officially released July 15, 1997

*Susan M. Cormier,* with whom were *Harold R. Cummings* and *Kenneth J. Bartschi,* for the appellants (defendants).

*Steven W. Varney,* with whom was *Robert T. Rimmer,* for the appellees (plaintiffs).

*Opinion*

CALLAHAN, C. J. The principal issue in this appeal is whether the trial court properly concluded that the plaintiffs suffered an "ascertainable loss of money or property," as required to maintain an action pursuant to General Statutes § 42-110g,[1] which is part of the Con-

---

[1] General Statutes § 42-110g provides in relevant part: "Action for damages. Class actions. Costs and fees. Equitable relief. Jury trial. (a) *Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action* in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, *to recover actual damages.* Proof of public interest or public injury shall not be required in any action brought under this section. *The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper. . . .*

"(d) In any action brought by a person under this section, the court may award, to the plaintiff, in addition to the relief provided in this section, costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery. In a class action in which there is no monetary recovery, but other relief is granted on behalf of a class, the court may award, to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorneys' fees. *In any action brought*

necticut Unfair Trade Practices Act (CUTPA), as the result of the installation of several video surveillance cameras by the named defendant, Daniel Quinn, on his property. The cameras were focused on the front entrances to the plaintiffs' two neighboring business establishments. We conclude, inter alia, that the trial court properly determined that the plaintiffs suffered an ascertainable loss as a result of Quinn's actions. We therefore affirm the judgment of the trial court.

The record reveals the following facts. At all relevant times, the plaintiffs, Service Road Corporation and Cousin Vinnie's, Inc., operated adjacent exotic dance clubs, known as Uncle Al's and Cousin Vinnie's, at 145 and 147 West Service Road in Hartford. Quinn operated an adult bookstore known as Danny's Adult Book World next to Uncle Al's and Cousin Vinnie's at 151 West Service Road. During the time period in question, Quinn also owned and operated two exotic dance clubs, one, known as Kahoots, located in East Hartford, the other, known as Carrie-Ann's, located in Vernon. Both Kahoots and Carrie-Ann's competed with Uncle Al's and Cousin Vinnie's for patrons. The other defendant in this case, Gordon Debigare, worked for Quinn as the manager of Kahoots.

On September 7, 1993, the plaintiffs, through their attorney, notified Quinn and the Hartford police department that customers of Danny's Adult Book World had been engaging in sexual activity and drug use at the rear of Quinn's property at 151 West Service Road. Approximately two weeks later, Quinn installed two video surveillance cameras on the south side of his building, which faced the north side of the plaintiffs' building, where the front entrances to both Uncle Al's

---

*under this section, the court may, in its discretion, order, in addition to damages or in lieu of damages, injunctive or other equitable relief.*" (Emphasis added.)

and Cousin Vinnie's were located. One of the cameras was situated so that it pointed directly at, and focused on, the front door of Uncle Al's, the other so that it pointed directly at, and focused on, the front door of Cousin Vinnie's. A short time later, Quinn installed additional cameras on his building, four of which also focused on the front doorways of Uncle Al's and Cousin Vinnie's. Sometime in October, 1993, Debigare contacted at least two patrons of the plaintiffs' clubs and informed them that he had seen them entering the plaintiffs' clubs on the security television attached to the surveillance cameras at 151 West Service Road. Debigare also provided several of the plaintiffs' patrons with free drink coupons that were redeemable at Kahoots. In addition, Debigare assisted in posting advertisements for Carrie-Ann's on the side of the building at 151 West Service Road that faced the front entrances of Uncle Al's and Cousin Vinnie's.

The plaintiffs filed a two count complaint and an application for a temporary injunction against the defendants in the trial court. In the first count of their complaint, the plaintiffs alleged that the defendants' actions tortiously interfered with the plaintiffs' business, causing them irreparable loss and damage. In the second count of the complaint, the plaintiffs claimed that the defendants' actions constituted unfair and deceptive acts and practices in the conduct of trade or commerce, in violation of CUTPA, General Statutes §§ 42-110a through 42-110q. In the first count, the plaintiffs sought damages, costs and temporary and permanent injunctions ordering the defendants to remove the cameras, or to adjust them so that they did not focus on the plaintiffs' property. In addition, the plaintiffs sought temporary and permanent injunctions ordering the defendants to refrain from contacting the plaintiffs' customers. In the CUTPA count, the plaintiffs sought both economic and punitive damages, temporary and

permanent injunctive relief, attorney's fees and costs, all under § 42-110g. Thereafter, the plaintiffs amended their complaint by removing from both counts any claim for economic damages.[2] Before trial, the parties stipulated to the entry of a temporary injunction against the defendants requiring the defendants to adjust the cameras that were capable of viewing the premises at 145 and 147 West Service Road so that at all times the cameras pointed downward at an angle of less than fifty degrees.

After a court trial, the trial court issued a memorandum of decision in which it found for the defendants on the first count of the plaintiffs' complaint and for the plaintiffs on the second count. The court concluded that Quinn's actions constituted an unfair trade practice in violation of § 42-110b.[3] The court issued the permanent injunction sought by the plaintiffs,[4] and also determined that the plaintiffs were entitled to attorney's fees and costs from Quinn. The court found that at all times

[2] The plaintiffs apparently amended their complaint in response to a discovery motion by the defendants seeking income tax returns.

[3] General Statutes § 42-110b provides in relevant part: "Unfair trade practices prohibited. Legislative intent. (a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ."

[4] The permanent injunction issued by the court provided: "After a trial in the above-captioned action, it is hereby ORDERED:

"1. Daniel Quinn, Gordon Debigare and their agents, servants and employees shall not point any video camera, closed circuit television camera or other camera located on the defendant Quinn's property at 151 West Service Road, Hartford, Connecticut, in the direction of the plaintiffs' premises at 145 or 147 West Service Road. All such cameras which are visible to persons entering 145 or 147 West Service Road shall be inverted in such a fashion that the base of the housing of such camera shall at all times point downward at an angle not to exceed fifty (50) degrees from the vertical plane of the south wall of 151 West Service Road.

"2. Daniel Quinn, Gordon Debigare and their agents, servants and employees shall not contact the plaintiffs' customers concerning the presence of the aforementioned cameras or the fact that the customers may have been or may in the future be observed on said cameras."

Debigare had acted simply as Quinn's agent and declined to award attorney's fees against him. The court also, in the exercise of its discretion, declined to award the plaintiffs punitive damages. On January 1, 1997, the court rendered judgment in accordance with its memorandum of decision and awarded the plaintiffs attorney's fees against Quinn in the stipulated amount of $14,930.30. The defendants appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).[5]

The defendants claim that the second count of the plaintiffs' amended complaint, which alleged a CUTPA violation, was insufficient as a matter of law because it contained no allegation that the plaintiffs had suffered an economic loss as a result of the defendants' conduct. The defendants contend that a plaintiff claiming a CUTPA violation in the context of a competitive business relationship must allege some economic loss in order to satisfy the ascertainable loss requirement of § 42-110g. They claim that the plaintiffs' amended complaint did not include such an allegation. In addition, the defendants claim that the trial court's factual determination that the plaintiffs had suffered an ascertainable loss was clearly erroneous in light of the evidence presented at trial. Consequently, they contend that the trial court's judgment ordering a permanent injunction and awarding the plaintiffs attorney's fees must be reversed. We are unpersuaded.

[5] There are two docket numbers in this case because the defendants initially appealed to the Appellate Court following the trial court's memorandum of decision. We transferred that appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). The defendants subsequently filed a second appeal to the Appellate Court from the trial court's rendering of judgment in accordance with its memorandum of decision. We granted the defendants' motion, to which the plaintiffs consented, to consolidate both appeals and incorporate into the second appeal the briefs filed in the first appeal.

I

As an initial matter, we decline to address the defendants' arguments concerning the legal sufficiency of the plaintiffs' amended complaint at this late stage of the proceedings. "[A] judgment ordinarily cures pleading defects . . . . The absence of a requisite allegation in a complaint that would have justified the granting of a motion to strike . . . is not a sufficient basis for vacating a judgment unless the pleading defect has resulted in prejudice. [I]f parties will insist on going to trial on issues framed in a slovenly manner, they must abide the verdict; judgment will not be arrested for faults in statement when facts sufficient to support the judgment have been substantially put in issue and found. . . . Want of precision in alleging the cause of an injury for which an action is brought, is waived by contesting the case upon its merits without questioning such defect." (Citations omitted; internal quotation marks omitted.) *Normand Josef Enterprises, Inc.* v. *Connecticut National Bank*, 230 Conn. 486, 497, 646 A.2d 1289 (1994); see also *Tedesco* v. *Stamford*, 215 Conn. 450, 458, 576 A.2d 1273 (1990), on remand, 24 Conn. App. 377, 588 A.2d 656 (1991), rev'd, 222 Conn. 233, 610 A.2d 574 (1992).

Instead of submitting a motion to strike the plaintiffs' amended complaint, the defendants waited until the close of the plaintiffs' evidence and then moved, pursuant to Practice Book § 302,[6] for a judgment of dismissal for failure of the plaintiffs to make out a prima facie

---

[6] Practice Book § 302 provides: "Dismissal in Court Cases for Failure to Make Out a Prima Facie Case

"If, on the trial of any issue of fact in a civil action tried to the court, the plaintiff has produced his evidence and rested his cause, the defendant may move for judgment of dismissal, and the court may grant such motion, if in its opinion the plaintiff has failed to make out a prima facie case. The defendant may offer evidence in the event the motion is not granted, without having reserved the right to do so and to the same extent as if the motion had not been made."

case.[7] Thus, the defendants challenged the sufficiency of the plaintiffs' evidence rather than the sufficiency of their pleading. Because the defendants did not raise their argument concerning the sufficiency of the plaintiffs' pleading in the trial court and have failed to demonstrate that they in any way were prejudiced by the plaintiffs' amended complaint,[8] we conclude that the defendants have waived this claim. *Normand Josef Enterprises, Inc.* v. *Connecticut National Bank,* supra, 230 Conn. 496–97.

## II

The defendants next contend that the trial court improperly concluded that the plaintiffs had sustained their burden of proving that they had suffered an ascertainable loss of money or property as required by § 42-110g. The defendants do not find fault with the trial court's determination that Quinn's actions constituted an unfair trade practice in violation of § 42-110b. They argue, rather, that the trial court committed clear error in concluding that the plaintiffs had proven that they had suffered an ascertainable loss as a result of Quinn's installation of the surveillance cameras. We disagree.

We begin our analysis with the principle that CUTPA "is remedial in character . . . and must be liberally construed in favor of those whom the legislature intended to benefit." (Citations omitted; internal quotation marks omitted.) *Fink* v. *Golenbock,* 238 Conn. 183, 213, 680 A.2d 1243 (1996). In *Larsen Chelsey Realty Co.* v. *Larsen,* 232 Conn. 480, 496–99, 656 A.2d 1009 (1995), we reaffirmed the principle, first stated in *McLaughlin Ford, Inc.* v. *Ford Motor Co.,* 192 Conn. 558, 566–67,

---

[7] The trial court reserved decision on the motion until after the defendants had presented their case.

[8] Indeed, the defendants have not argued, either in their briefs or at oral argument, that they were prejudiced by a defect in the plaintiffs' amended complaint.

473 A.2d 1185 (1984), that CUTPA was designed to provide protection to businesses as well as to consumers.[9] "CUTPA is not limited to conduct involving consumer injury. . . . [A] competitor or other business person can maintain a CUTPA cause of action without showing consumer injury." *McLaughlin Ford, Inc.* v. *Ford Motor Co.*, supra, 566–67.

Section 42-110b (a) prohibits persons from engaging in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Section 42-110g (a) affords a cause of action to "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b . . . ." We have stated that "[t]he ascertainable loss requirement is a threshold barrier which limits the class of persons who may bring a CUTPA action seeking either actual damages or equitable relief." *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 615, 440 A.2d 810 (1981). An ascertainable loss is a "deprivation, detriment [or] injury" that is "capable of being discovered, observed or established." (Internal quotation marks omitted.) Id., 613. "[A] loss

---

[9] In *Larsen Chelsey Realty Co.*, we reviewed the legislative history that suggested that the legislature intended CUTPA to protect businesses as well as consumers: "According to Representative Howard A. Newman, who reported the CUTPA legislation out of committee to the House of Representatives, the act 'gives honest businessmen great protection [against] deceptive or unscrupulous [businessmen] who by unfair methods of competition and deceptive advertising, etc., unlawfully divert trade away from law abiding businessmen.' 16 H.R. Proc., Pt. 14, 1973 Sess., p. 7323. Other supporters of the bill made similar comments. See, e.g., Conn. Joint Standing Committee Hearings, General Law, Pt. 2, 1973 Sess., p. 724, remarks of Stuart Dear, a member of the board of directors of the Connecticut Consumer Association (CUTPA will 'assist the businessman in not losing out to those members of the business community who won't play fair'); Conn. Joint Standing Committee Hearings, General Law, Pt. 1, 1978 Sess., pp. 307–308, remarks of Assistant Attorney General Robert M. Langer (CUTPA covers transactions 'between one business and another business')." *Larsen Chelsey Realty Co.* v. *Larsen*, supra, 232 Conn. 497–98.

is ascertainable if it is measurable even though the precise amount of the loss is not known. . . . Under CUTPA, there is no need to allege or prove the amount of the ascertainable loss." Id., 614. A plaintiff need not "prove a specific amount of actual damages in order to make out a prima facie case [under CUTPA]." Id., 612–13.

With these principles in mind, we turn to the validity of the trial court's finding that the plaintiffs suffered an ascertainable loss. In its memorandum of decision, the trial court stated: "At trial, representatives of the plaintiffs testified that they had no evidence that Quinn's actions caused them a loss of profits. This may be due in part to the entry of a temporary injunction on April 22, 1994, under the terms of which the cameras were pointed away from the plaintiffs' front doorways. Not surprisingly, the plaintiffs also failed to present the testimony of any patron or prospective patron concerning the effect Quinn's cameras had on their willingness to enter the plaintiffs' exotic dance clubs. *Nevertheless, the court finds that Quinn's cameras, when pointed at the entrance to the plaintiffs' exotic dance clubs, were intended to and probably would have a negative impact on the plaintiffs' business because they would deter certain prospective patrons from entering the clubs.*" (Emphasis added.)

The plaintiffs had the burden to prove, by a preponderance of the evidence, that they suffered an ascertainable loss of money or property as the result of the defendants' actions. In order to satisfy that burden, the plaintiffs needed to convince the trial court that it was more likely than not that the plaintiffs suffered such a loss. See *Tianti* v. *William Raveis Real Estate, Inc.,* 231 Conn. 690, 701, 651 A.2d 1286 (1995). A fair reading of the trial court's memorandum of decision indicates that the court was persuaded that it was more likely than not that Quinn's installation of cameras on the

building at 151 West Service Road and the monitoring
of the entrances to the plaintiffs' establishments caused
prospective patrons to refrain from entering the plain-
tiffs' establishments. The trial court found that Quinn's
actions "probably would have a negative impact on the
plaintiffs' business because they would deter certain
prospective patrons from entering the clubs." We read
this to mean that the trial court found, as a matter
of fact, that Quinn's installation of cameras did deter
prospective customers from patronizing the plaintiffs'
establishments. The defendants claim that this factual
finding is not supported by the evidence that was
adduced at trial. We disagree.

"[A] trial court's findings are binding upon this court
unless they are clearly erroneous in light of the evidence
and the pleadings in the record as a whole. . . . We
cannot retry the facts or pass on the credibility of the
witnesses. . . . A finding of fact is clearly erroneous
when there is no evidence in the record to support it
. . . or when although there is evidence to support it,
the reviewing court on the entire evidence is left with
the definite and firm conviction that a mistake has been
committed. . . . *Crowell* v. *Danforth*, 222 Conn. 150,
156, 609 A.2d 654 (1992); see also *Pandolphe's Auto
Parts, Inc.* v. *Manchester*, 181 Conn. 217, 220, 435 A.2d
24 (1980)." (Internal quotation marks omitted.) *United
Components, Inc.* v. *Wdowiak*, 239 Conn. 259, 263, 684
A.2d 693 (1996).

"It is axiomatic that the trier of fact may draw reason-
able and logical inferences from the facts proven. . . .
In doing so, finders of fact are not expected to lay aside
matters of common knowledge or their own observa-
tion and experience of the affairs of life, but, on the
contrary, to apply them to the evidence or facts in hand,
to the end that their action may be intelligent and their
conclusions correct . . . . Our review of the fact find-
er's inferences is limited to determining whether the

inferences drawn are so unreasonable as to be unjustifiable." (Citations omitted; internal quotation marks omitted.) *Tianti* v. *William Raveis Real Estate, Inc.*, supra, 231 Conn. 700–701. "In a civil case, proof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the material fact." (Internal quotation marks omitted.) *Connecticut Bank & Trust Co., N.A.* v. *Reckert*, 33 Conn. App. 702, 704–705, 638 A.2d 44 (1994).

We conclude that the trial court reasonably could have inferred from the evidence presented during the trial that the defendants' actions caused prospective patrons to refrain from entering the plaintiffs' establishments at 145 and 147 West Service Road. The plaintiffs had presented evidence that they operated two exotic dance clubs at those addresses. They also presented evidence, which the trial court found credible, that Quinn had installed the surveillance cameras on his building at 151 West Service Road with the intention of interfering with the plaintiffs' establishments.[10] In

---

[10] In its memorandum of decision, the trial court stated: "The plaintiffs claim that the primary, if not sole, purpose of Quinn's camera installation was to intimidate and harass their customers and harm their businesses and, therefore, that such installation constituted an unfair or deceptive practice within the meaning of § 42-110b. The court agrees.

"Quinn has claimed that he installed the cameras purely for security reasons. However, the court does not find that claim to be credible. A disproportionately large number of the video cameras were placed on the side of Quinn's building which was nearest to Uncle Al's and Cousin Vinnie's with no camera surveillance of the [entrance] to Quinn's store or its main parking lot. A security expert who testified at the trial described Quinn's camera configuration as 'absurd' in terms of providing optimum security surveillance of Quinn's premises.

"A business is certainly permitted to install security cameras for its own protection and cannot be accused of an unfair practice if one or more of those cameras incidentally picks up activity on the premises of a nearby business. *In this case the purpose of the camera installation was to interfere*

addition, the plaintiffs presented evidence that the cameras on the building at 151 West Service Road were visible to a person standing in the entrances to both Uncle Al's and Cousin Vinnie's and that such a person would believe that he or she was being filmed.[11] Moreover, the plaintiffs presented Alan Tannenbaum, the treasurer of Service Road Corporation and the president of Cousin Vinnie's, Inc., who testified that the cameras on Quinn's building at 151 West Service Road intimidated customers of Uncle Al's and Cousin Vinnie's, Inc. Tannenbaum testified that a number of patrons had informed him that they made sure that they entered his establishments with their backs toward Quinn's cameras. He also testified that he believed that some patrons had not entered his establishments because of the cameras, but that he did not know of any particular patrons who had refrained from doing so.[12] We conclude, on

with the plaintiffs' business and the security benefits to the defendant Quinn's property [were] incidental. The number and placement of the video cameras described above, the temporal proximity of the camera installation to a complaint directed at Quinn by the plaintiffs, and the contacting of the plaintiffs' patrons concerning their appearance on Quinn's video cameras, indicates a primary intention to impact the plaintiffs' business." (Emphasis added.)

[11] The plaintiffs presented testimony from Thomas Luddy, a security expert, who testified as follows:

"Q. When you first went to the premises and conducted your inspection, you did that inspection in part from the premises at 145/147 West Service Road, in other words, looking across the driveway to 151?

"A. Yes, I did.

"Q. Were you able, sir, during that inspection, to stand in the doorways of the premises of Uncle Al's and Cousin Vinnie's and to look at the cameras mounted on 151 West Service Road?

"A. Yes, which I did.

"Q. And would you tell the court from those two vantage points where the cameras or the housings appeared to be directed?

"A. At least a couple of them and the third one that was panned and tilted, the 180 degree one, certainly I would feel like I had been on Candid Camera, so to speak. If I were standing in the doorway, I would have been viewed."

[12] The relevant colloquy went as follows:

"Q. . . . . Is it my understanding, Mr. Tannenbaum, that your complaint is

the basis of the totality of the evidence presented at trial, that the trial court's factual determination that Quinn's installation of cameras on the building at 151 West Service Road deterred prospective patrons from entering the plaintiffs' establishments was not clearly erroneous.

We next address the question of whether the trial court's factual finding satisfied the ascertainable loss requirement of § 42-110g. We have never addressed the meaning of the phrase "ascertainable loss" in a similar context, in which one business owner claims that another has engaged in an intentional unfair trade practice that has caused the first business to lose potential customers.[13] Nevertheless, we conclude that, in the business context, a plaintiff asserting a CUTPA claim may satisfy the ascertainable loss requirement of § 42-

that at least two of the cameras on Mr. Quinn's building at 151 West Service Road point at the two entrances to your building?

"A. Yes.

"Q. And why is that a problem for you?

"A. Because it intimidated our customers.

"Q. How long have customers, in fact, stopped coming to your business because of their complaint to you about these cameras?

"A. I don't think there is any way of knowing that. It's like going to a restaurant, you have a lousy meal, you don't tell anybody and you don't go back.

"Q. So, has any customer come to you and said, Mr. Tannenbaum, I'm no longer coming to your business because I'm afraid of those cameras across the alley?

"A. I've had a couple of people tell me they make sure they walk in with their back to the camera.

"Q. But they're still coming in?

"A. Some people haven't, I'm sure.

"Q. But you don't know of any?

"A. I can't tell you for a fact."

[13] In *Sportsmen's Boating Corp.* v. *Hensley*, 192 Conn. 747, 748–49, 474 A.2d 780 (1984), the plaintiff, a corporation, brought a CUTPA action against the defendant, a business competitor, alleging that the defendant had engaged in unfair trade practices that resulted in the plaintiff's losing potential customers. The trial court found, however, that the plaintiff had not lost any potential customers as a result of the defendant's actions. Id., 749. Because our analysis in *Sportsmen's Boating Corp.* was limited to whether

110g by establishing, through a reasonable inference, or otherwise, that the defendant's unfair trade practice has caused the plaintiff to lose potential customers. A loss of prospective customers constitutes a "deprivation, detriment [or] injury" that is "capable of being discovered, observed or established." (Internal quotation marks omitted.) *Hinchliffe* v. *American Motors Corp.*, supra, 184 Conn. 613. Such a loss appears to be precisely the type of business injury for which the legislature intended to provide redress when it enacted CUTPA. See *Larsen Chelsey Realty Co.* v. *Larsen*, supra, 232 Conn. 496–97. The fact that a plaintiff fails to prove a particular loss or the extent of the loss does not foreclose the plaintiff from obtaining *injunctive relief* and attorneys' fees pursuant to CUTPA if the plaintiff is able to prove by a preponderance of the evidence that an unfair trade practice has occurred and a reasonable inference can be drawn by the trier of fact that the unfair trade practice has resulted in a loss to the plaintiff. In the present case, the trial court found that the defendants engaged in an intentional unfair trade practice and drew the reasonable inference that the unfair trade practice had caused the plaintiffs to lose potential customers. We conclude, therefore, that the plaintiffs satisfied their burden of proving that they had suffered an ascertainable loss.

After properly finding that the plaintiffs had suffered an ascertainable loss as the result of the defendants' unfair trade practices, the trial court exercised its discretion, pursuant to § 42-110g, to issue a permanent

the trial court's factual finding was clearly erroneous, we did not have occasion to address whether a loss of potential customers would constitute an ascertainable loss of money or property as required by § 42-110g.

In *Hinchliffe* v. *American Motors Corp.*, supra, 184 Conn. 612–16, we analyzed the ascertainable loss requirement at length, but in the context of a consumer claim under CUTPA rather than in the context of a claim by one business against another. Our analysis in *Hinchliffe*, therefore, does not provide us with an answer to the question posed in the present case.

injunction and to award the plaintiffs attorney's fees. The defendants have failed to persuade us that the trial court abused its discretion in so doing.

The judgment is affirmed.

In this opinion BORDEN, BERDON and PETERS, Js., concurred.

KATZ, J., dissenting. I agree with the majority as to the meaning of "ascertainable loss" in the context of a claim pursuant to the Connecticut Unfair Trade Practices Act (CUTPA); General Statutes § 42-110a et seq.; and how such loss may be proven without presenting evidence of specific economic losses. I disagree, however, with the majority's conclusion that the trial court correctly found that the plaintiffs had suffered an ascertainable loss entitling them to seek an injunction and attorney's fees under CUTPA, in light of the trial court's conclusion in its memorandum of decision that there had been no evidence presented to support a finding that the plaintiffs had suffered any loss whatsoever.[1] I believe that the record demonstrates that the plaintiffs proved only that there was an unfair trade practice and that the offending practice was undertaken with the intent that they should suffer such a loss.[2]

"Under CUTPA, '[t]he ascertainable loss requirement is a threshold barrier which limits the class of persons

---

[1] In its memorandum of decision, the trial court stated: "At trial, representatives of the plaintiffs testified that they had no evidence that [the named defendant Daniel] Quinn's actions caused them a loss of profits. . . . [T]he plaintiffs also failed to present the testimony of any patron or prospective patron concerning the effect Quinn's cameras had on their willingness to enter the plaintiffs' exotic dance clubs."

[2] Although I understand that it was not the intent of the majority, I am nevertheless concerned that, because this decision relies on evidence that proves only that there was an unfair trade practice, the court's holding may be read to support the argument that a plaintiff may prove an ascertainable loss entitling him or her to relief under CUTPA merely by proving that there was an unfair trade practice undertaken with the intent to bring about such a loss.

who may bring a CUTPA action seeking either actual damages or equitable relief.' . . . *Hinchliffe* v. *American Motors Corporation*, 184 Conn. 607, 615, 440 A.2d 810 (1981)." *Conaway* v. *Prestia*, 191 Conn. 484, 494, 464 A.2d 847 (1983). To allow the unfair trade practice itself to be offered as proof of that loss would negate the effect of having such a threshold requirement. In this case, it is clear from the trial court's comments that it based its findings in regard to ascertainable loss on the fact that there was an unfair trade practice and that the practice was apparently intended to deter customers from entering the plaintiffs' businesses. I disagree with the majority's conclusion that this evidence was sufficient.

As an initial matter, I acknowledge that our review of the trial court's findings is limited. "[W]e will upset a factual determination of the trial court only if it is clearly erroneous. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole . . . . We cannot retry the facts or pass on the credibility of the witnesses." (Internal quotation marks omitted.) *24 Leggett Street Ltd. Partnership* v. *Beacon Industries, Inc.*, 239 Conn. 284, 301, 685 A.2d 305 (1996). This limited review does not mean, however, that we may not conclude that the trial court's findings were purely speculative, and had no basis in the evidence adduced at trial. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . *Crowell* v. *Danforth*, 222 Conn. 150, 156, 609 A.2d 654 (1992); see also *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 220, 435 A.2d 24 (1980). . . . *Groton* v. *Yankee Gas Services Co.*, 224 Conn. 675, 691, 620 A.2d 771 (1993)."

(Internal quotation marks omitted.) *24 Leggett Street Ltd. Partnership* v. *Beacon Industries, Inc.*, supra, 301.

As for the present case, "[i]t is axiomatic that a claimant seeking [relief under CUTPA] bears the burden of proving, with reasonable certainty, those [ascertainable losses] sustained as a result of [the unfair practice]." *Conaway* v. *Prestia*, supra, 191 Conn. 493–94. It is true that such proof may be inferred from the circumstances of the case. "The test of the sufficiency of proof by circumstantial evidence [however] is whether rational minds could reasonably and logically draw the inference. . . . The proof need not be so conclusive that it precludes every other hypothesis. It is sufficient if the proof produces in the mind of the trier a reasonable belief that it is more probable than otherwise that the fact to be inferred is true." (Citations omitted; internal quotation marks omitted.) *Puro* v. *Henry*, 188 Conn. 301, 310, 449 A.2d 176 (1982). "Although the elements of a cause of action may be established on the basis of inferences drawn from circumstantial evidence; see, e.g., *Cayer* v. *Salvatore*, 150 Conn. 361, 363, 189 A.2d 505 (1963); such inferences [however] 'must be reasonable and logical, and the conclusions based on them must not be the result of speculation and conjecture.' *Palmieri* v. *Macero*, 146 Conn. 705, 708, 155 A.2d 750 (1959). An inference must have some definite basis in the facts. See *Latham* v. *Hankey*, 117 Conn. 5, 10–11, 166 A. 400 (1933)." *Boehm* v. *Kish*, 201 Conn. 385, 389, 517 A.2d 624 (1986); see also *Kuczon* v. *Tomkievicz*, 100 Conn. 560, 567–68, 124 A. 226 (1924) (" 'if [the evidence] is a mere speculation and a mere probability and uncertainty, why, no verdict should be found upon it' ").

In its memorandum of decision, the trial court stated that despite the lack of direct evidence of any loss, "[the named defendant Daniel] Quinn's cameras, when pointed at the entrance to the plaintiffs' exotic dance clubs, were intended to and probably would have a

negative impact on the plaintiffs' business because they would deter certain prospective patrons from entering the clubs." The majority translates "probably would have a negative impact" into a factual finding that the cameras *actually deterred* prospective customers from entering the plaintiffs' clubs and concludes that there was sufficient evidence adduced at trial to support this finding. A review of the entire evidence, however, reveals that such a finding has no basis in fact but, rather, is purely speculative and, therefore, clearly erroneous.

In 195 pages of trial transcript, only two pages contain testimony from the plaintiffs related to possible, ascertainable, losses. Alan Tannenbaum, the treasurer of the named plaintiff Service Road Corporation and the president of the plaintiff Cousin Vinnie's Backroom, Inc., testified that the cameras intimidated customers.[3] When

[3] During cross-examination by the defendants' attorney, Tannenbaum testified regarding his belief as to the effect the cameras may have had on potential customers:

"Q. Is it my understanding, Mr. Tannenbaum, that your complaint is that at least two of the cameras on Mr. Quinn's building at 151 West Service Road point at the two entrances to your building?

"A. Yes.

"Q. And why is that a problem for you?

"A. Because it intimidated our customers.

"Q. How long have customers, in fact, stopped coming to your business because of their complaint to you about these cameras?

"A. I don't think there is any way of knowing that. It's like going to a restaurant, you have a lousy meal, you don't tell anybody and you don't go back.

"Q. So, has any customer come to you and said, Mr. Tannenbaum, I'm no longer coming to your business because I'm afraid of those cameras across the alley?

"A. I've had a couple of people tell me they make sure they walk in with their back to the camera.

"Q. But they're still coming in?

"A. Some people haven't, I'm sure.

"Q. But you don't know of any?

"A. I can't tell you for a fact."

Neither of the plaintiffs testified on direct examination regarding the possible loss of customers.

asked if he knew this for a fact, however, he was unable to point to any single instance of a customer being deterred from entering the club. In fact, the *only* evidence Tannenbaum presented concerning customer intimidation was that "a couple of people" had told him that they were aware of the cameras but, nevertheless, had entered the clubs, albeit with their backs to the cameras. When asked if customers were still coming to the clubs, Tannenbaum could only respond: "Some people haven't, I'm sure." The only other discussion as to the possible intimidation of customers was in Quinn's testimony, wherein he was asked by the plaintiffs' attorney to comment on whether he believed that the cameras he had installed might have an effect on the plaintiffs' businesses.[4] No evidence, direct or circumstantial, was adduced in either colloquy to support even an inference that customers were actually deterred by the presence of the cameras, or any other actions by the defendants, from entering the plaintiffs' businesses.

---

[4] The transcript contains the following colloquy between Quinn and the plaintiffs' attorney:

"Q. Okay. Sir, when those cameras were installed . . . did you take into account the possible effect these cameras may have had on customers of [the plaintiffs]?

"A. Absolutely not.

"Q. Why not?

"A. Well, I have cameras on all my businesses, including the exterior.

"Q. All right . . . [d]o the housings of cameras on your other buildings point to other establishments, other businesses?

"A. Absolutely.

"Q. They do? Okay, sir, do you think that the kind of business that [the plaintiffs] are engaged in, similar to your own, would make a difference in deciding whether or not a patron or customer might be troubled by having a housing or housings pointed at him or at her?

"A. Absolutely not."

Following this colloquy, the trial court interrupted Quinn's testimony to state that, notwithstanding Quinn's opinion, it found that the plaintiffs' establishments were such that "having a camera trained on you as you're entering or exiting, the nature of the business could well make a difference and that people might not want to have a camera due to the nature of the business. You need go no further trying to prove that."

Indeed, any finding to such effect is merely speculation built upon speculation, because the plaintiffs themselves had admitted that they did not know whether they had lost any customers or business *or* whether any such loss, even if ascertainable, could be attributed to the defendants' actions. Rather than relying on the evidence before it, the trial court, in effect, concluded that, as a matter of law, the existence of the cameras would have a detrimental effect on the plaintiffs' businesses and, therefore, *did* have a detrimental effect on the plaintiffs' business. Such a conclusion dispenses with the requirement of CUTPA that the plaintiffs prove an ascertainable loss in addition to proving an unfair trade practice causing such a loss. See footnote 2 of this opinion.

Therefore, I respectfully dissent.