RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0224p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

PREMIUM FREIGHT MANAGEMENT, LLC,

*Plaintiff*,

*v.*

PM ENGINEERED SOLUTIONS, INC.,
*Defendant-Appellee/Cross-Appellant*,

BOSAL INDUSTRIES-GEORGIA, INC.,
*Defendant-Appellant/Cross-Appellee*.

Nos. 16-4324/17-3832/3841

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:14-cv-02635—Jack Zouhary, District Judge.

Argued: July 25, 2018

Decided and Filed: October 10, 2018

Before: COLE, Chief Judge; SUTTON and LARSEN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Gary J. Mouw, VARNUM LLP, Grand Rapids, Michigan, for Appellant/Cross-Appellee. Henry S. Weinstock, NOSSAMAN LLP, Los Angeles, California, for Appellee/Cross-Appellant. **ON BRIEF:** Gary J. Mouw, Matthew T. Anderson, VARNUM LLP, Grand Rapids, Michigan, for Appellant/Cross-Appellee. Henry S. Weinstock, NOSSAMAN LLP, Los Angeles, California, Jeffrey P. Mueller DAY PITNEY LLP, Hartford, Connecticut, for Appellee/Cross-Appellant.

COLE, C.J., delivered the opinion of the court in which SUTTON, J., joined, and LARSEN, J., joined in part. LARSEN, J. (pp. 11–15), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

COLE, Chief Judge.  Federal courts sitting in diversity may question the wisdom of state laws, but they are powerless to change them.  For better or worse, Connecticut imposes liability for breaches of contract when attended by deception.  Unhappy with flanges purchased under a contract with PM Engineered Solutions, Inc. ("Powdered Metal"), Bosal Industries-Georgia, Inc. ("Bosal") decided to switch suppliers and terminate the contract.  After a five-day bench trial, the district court found that the termination was not only wrongful in breach of the contract, but that it was deceptive in violation of the Connecticut Unfair Trade Practices Act.  Because Connecticut law applies and the district court's findings rest on a permissible view of the evidence, we affirm except as to the calculation of postjudgment interest on damages.

## I.  BACKGROUND

Powdered Metal was itching to get into the automotive industry.  The powdered metal flange was its ticket.  Through an independent sales representative, it offered to supply the part to Bosal.  After welding the flanges onto exhaust pipes, Bosal would sell the assembled part to a third manufacturer, DMAX, who would then use the flange to mount the exhaust system to diesel engines sold to General Motors.

The parties entered into a contract, which took the form of a quote accepted by Bosal. Powdered Metal agreed to supply 90,000 flanges per year with a monthly output of 7,500 flanges, which were to be delivered to Bosal in Connecticut.  Connecticut was also the state where Powdered Metal operated and manufactured the flanges.  Initial orders would not be fulfilled until sixteen weeks after the flange specifications were finalized in early June 2014. This lead time would allow Powdered Metal to make any necessary arrangements to fulfill the orders, such as obtaining raw materials and training employees.

Sixteen weeks was not soon enough.  Due to mounting pressure from DMAX, Bosal demanded delivery of the first batch of flanges by late June 2014 and an increased monthly

output moving forward.  This was not an idle demand.  Failure to comply with its demands would put a kink in the supply chain and shut down the General Motors assembly line.  And if it did not comply, Bosal warned that it, DMAX, or General Motors would "crush" Powdered Metal with litigation or chargebacks of a million dollars a day.  Powdered Metal gave in to Bosal's demands.

Manufacturing problems quickly emerged.  Cracks in the flanges began to appear in early July and production temporarily moved from Connecticut to Illinois in August after a machine press failed on two occasions.  After the cracks became more prevalent in later shipments, Bosal instructed Powdered Metal in mid-October to halt production so that it could identify the root cause of the cracked flanges.

Two months passed without a word from Bosal.  Its silence gave rise to speculation.  In a late October email to Powdered Metal from its parent company, PSM Industries, Inc., one executive surmised that Bosal "went deep and silent" because it "went back to an earlier design with . . . a stamped flange" and switched suppliers.  (Trial Ex. 97, Appx. 0037.)  But there was still a belief that new orders would come in after completing the root cause investigation.

As it turned out, Bosal had switched suppliers.  It had been talking with suppliers in secret as early as late September and by mid-October, the same time it halted production at Powdered Metal, it had already finalized its decision to switch to a different supplier and to terminate the contract with Powdered Metal.  Meanwhile, Bosal told Powdered Metal it was completing a root cause investigation, accepted additional flanges, and applauded it for its "continued support to return to a normalized situation where we can fill the pipeline."  (Trial Ex. 48, Appx. 0030.)  It did not notify Powdered Metal of its decision to terminate the contract, however, until December 12.

Powdered Metal then brought a claim against Bosal under the Connecticut Unfair Trade Practices Act.  After a five-day bench trial, the district court found that Bosal's termination of the contract was not only wrongful, but that its conduct in doing so was "clearly misleading and intentional"—and thus deceptive in violation of the Act.  (R. 123, PageID 4129–30.)  The district court awarded Powdered Metal $784,360 in attorneys' fees under the Act, $51,550 in discovery

sanctions, and $216,934.44 in damages for a related breach-of-contract claim, including postjudgment interest on damages at the Connecticut statutory rate of ten percent. Both parties appealed.

## II.  ANALYSIS

We review the district court's findings of fact for clear error and its conclusions of law de novo in an appeal from a judgment entered after a bench trial. *Byrne v. United States*, 857 F.3d 319, 326 (6th Cir. 2017). Mindful of our deference to factual findings, we conclude that the district court did not err in holding that Bosal's wrongful termination of the contract violated the Connecticut Unfair Trade Practices Act based on its finding of attendant deception. Nor was its determination of fees and damages an abuse of discretion apart from its calculation of postjudgment interest.

### A.  Choice of Law

As an initial matter, we agree with the district court that Connecticut law is the proper choice of law, so that Powdered Metal's claim properly arises under the Connecticut Unfair Trade Practices Act.

We are presented here with a choice between Connecticut and Michigan law. In choosing between them, we must apply the choice-of-law rules of Ohio as the forum state, which has adopted the two-step approach set forth in the Restatement (Second) of Conflict of Laws. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Morgan v. Biro Mfg. Co.*, 474 N.E.2d 286, 288 (Ohio 1984). The first step is to determine if there is an actual conflict between the substantive laws of the states involved. *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 861 N.E.2d 109, 115 (Ohio 2006). Only if they conflict must we proceed to the second step to choose between them. *Morgan*, 474 N.E.2d at 288–89.

There is no real dispute that the two states' laws conflict. Connecticut recognizes the type of claim brought against Bosal, while Michigan forecloses it. Michigan, like Connecticut, prohibits unfair trade practices under the Michigan Consumer Protection Act. *Compare* Mich. Comp. Laws § 445.903(1), *with* Conn. Gen. Stat. § 42-110b. Unlike Connecticut law, however,

it does not apply to the type of business transaction at issue here.  Instead, it applies only to "the conduct of a business providing goods, property or services, primarily for personal, family or household purposes."  *Slobin v. Henry Ford Health Care*, 666 N.W.2d 632, 634 (Mich. 2003) (quoting Mich. Comp. Laws § 445.902(d)).

The dispute is one of choice.  For claims sounding in tort, as here, we must choose the law of the state with "the most significant relationship to the occurrence and the parties." Restatement § 145(1); *see Bailey Employment Sys., Inc. v. Hahn*, 655 F.2d 473, 475 (2d Cir. 1981).  To make that determination, we are instructed to consider:

> (1) the place of business of the parties;
>
> (2) the place where the injury occurred;
>
> (3) the place where the conduct causing the injury occurred;
>
> (4) the place where the relationship, if any, between the parties is centered; and
>
> (5) any factors under Section 6 that we may deem relevant to the action.

*Morgan*, 474 N.E.2d at 289 (citing Restatement § 145(2)).  These factors are to be evaluated according to their relative importance to the issue presented.  *Id.* (citing Restatement § 145).

As is often the case in multistate disputes, many of the location-based factors point in opposite directions.  Powdered Metal's principal place of business is in Connecticut, while Bosal's is in Michigan.  And Powdered Metal suffered financial injuries in Connecticut, while Bosal's conduct causing those injuries occurred primarily in Michigan.  No matter how Bosal puts it, the place of business of nonparty entities, like General Motors, has no place in an inquiry that expressly looks to the location of "the parties."  Restatement § 145(2)(c).

The remaining factors point in the direction of applying Connecticut law.  The relationship between the parties is centered in Connecticut.  It is true that Powdered Metal initiated the relationship through an independent sales representative in Michigan.  But it did not remain centered there for long.  The remainder of the relationship centered around the purchase of flanges under the contract, nearly all of which were manufactured in Connecticut.  They were also delivered there.  Under the law of both states, "title passes to the buyer at the time and place

at which the seller completes his performance with reference to the delivery of goods."  Mich. Comp. Laws § 440.2401(b); Conn. Gen. Stat. § 42a-2-401.  Because the contract specifies "F.O.B. (Watertown, CT.)," Powdered Metal completed performance—and ownership of the flanges transferred to Bosal—in Connecticut.  (Trial Ex. 5, Appx. 0020.)

Taking into account the interests of each state in having its own law applied under Section 6 of the Restatement confirms that Connecticut law should apply.  Restatement § 6(2)(c). Michigan unquestionably has an interest in protecting its businesses from excessive liability for unfair trade practices.  *See In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979*, 644 F.2d 594, 613–14 (7th Cir. 1981).  But the state with the "strongest interest" in regulating unfair trade practices, whether liability is imposed or foreclosed, is the state where the harm occurred. *See Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946 (6th Cir. 2011).  Because the harm occurred in Connecticut, it is Connecticut that has the strongest interest.

The parties do not contend that any other Section 6 factor is relevant, save for one.  Bosal contends that applying Michigan law would provide "certainty, predictability, and uniformity of result" in its disputes with other suppliers.  Restatement § 6(f).  As we see it, the only uniformity concern in applying Connecticut law is that Bosal may be subject to liability in some disputes, but not others.  That is not the sort of variation that concerns us.  Uniformity concerns come into play when applying different laws to the same contract.  *Mill's Pride, Inc. v. Cont'l Ins. Co.*, 300 F.3d 701, 710 (6th Cir. 2002).  And there is no indication that Bosal's unspecified contracts with other suppliers include the same terms as the one with Powdered Metal, especially given that it was Powdered Metal that drafted the contract.

### B.  Connecticut Unfair Trade Practices Act

The wrongful termination of the flange contract, paired with Bosal's attendant deception, violated the Connecticut Unfair Trade Practices Act.  The Act prohibits any person from engaging in "unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).  To prevail, a plaintiff must prove: (1) an unfair or deceptive act or practice, (2) an ascertainable loss, and (3) causation—that the loss was realized as a result of the improper act or practice.  *Id.* § 42-110g(a).

Under the Act, deceptive conduct extends to simple breaches of contract when accompanied by intentional misrepresentations.  *Naples v. Keystone Bldg. & Dev. Corp.*, 990 A.2d 326, 337–38 (Conn. 2010) (collecting cases).  On this point, the parties agree.  The disagreement centers not on a question of law, but on whether the contract was breached and whether Bosal made an intentional misrepresentation as part of that breach.  We review the district court's factual findings on these issues for clear error.  *Byrne*, 857 F.3d at 326.

The termination was wrongful in breach of the contract because Bosal's two-month delay failed to provide reasonable notice of termination.  It is true that the contract does not specify a precise end date, so that it is terminable at will.  Conn. Gen. Stat. § 42a-2-309(2).  Under Connecticut law, however, contracts of indefinite duration still require "reasonable notification" of termination.  *Id.* § 42a-2-309(2).

Through its silence and secret dealings, Bosal also intentionally misled Powdered Metal into believing that it planned to fulfill the contract.  It did so by accepting additional flanges from Powdered Metal and, on October 6, highlighting Powdered Metal's "continued support to return to a normalized situation where we can fill the pipeline," all the while knowing that it had already decided to switch suppliers.  (Trial Ex. 48, Appx. 0030.)  Indeed, an internal email suggests that Bosal decided to switch suppliers as early as September 19, 2014 (Trial Ex. 207, Appx. 0237–0239) and had reached an agreement with a new supplier (SSI) by October 3, 2014 (Trial Ex. 29, Appx. 0078–0079.)  Although the district court's opinion does not explicitly reference these emails, we may affirm on any grounds supported by the record.  *See Lawrence v. Chancery Court of Tennessee*, 188 F.3d 687, 691 (6th Cir. 1999).  If that were not enough, Bosal indicated on October 13 that it was halting production not because of its decision made by that time to terminate the contract, but "due to the ongoing root cause analysis." (Trial Ex. 26, Appx. 0076.)  And, as the district court found, Bosal and Powdered Metal continued to engage in root cause analysis until December, even starting a new phase of the analysis called density testing "after Bosal decided to switch flange suppliers." (R. 123, PageID 4125.)  Instead of dispelling the belief that new orders would come in after completing the analysis, Bosal chose to conceal its decision to terminate the contract even as it strung Powdered Metal along during this period.

Bosal would have us interpret its silence as reasonable notification of termination, pointing to a late October email from PSM Industries to Powdered Metal surmising the same. In that email, one executive speculated that it "[l]ooks like they went back to an earlier design with . . . a stamped flange" and switched suppliers. (Trial Ex. 97, Appx. 0037.) But one executive's speculation does not amount to knowledge, let alone notice of termination. And even if that interpretation were permissible, the district court's interpretation after a five-day bench trial that it did not amount to notice is equally so. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985). It is with that principle in mind that we also reject Bosal's contention that its representations were anything other than intentionally misleading.

Finally, Powdered Metal has met its minimal burden to show that it suffered an ascertainable loss as a result of the deception. A plaintiff need only prove that the deceptive conduct was the proximate cause of a loss that is "capable of being discovered, observed or established." *Hinchliffe v. Am. Motors Corp.*, 440 A.2d 810, 815 (Conn. 1981). As the district court found, the deception deprived Powdered Metal of the remaining value of the contract and potential customers. The remaining value of the contract may not extend beyond the reasonable notification period and Powdered Metal declined to seek damages for lost customers. But these shortcomings merely serve to limit or foreclose its ability to recover damages. Powdered Metal may still recover reasonable attorneys' fees under the Act. *Serv. Rd. Corp. v. Quinn*, 698 A.2d 258, 265 (Conn. 1997).

### C. Attorneys' Fees

The district court acted within its discretion in awarding attorneys' fees to Powdered Metal. *See* Conn. Gen. Stat § 42-110g. The amount is challenged by both parties, so it should come as no surprise that Bosal argues for less, while Powdered Metal argues for more. We ordinarily defer to a district court's determination of a fee award and will overturn its decision only if it abuses its discretion. *Hayes v. Comm'r of Soc. Sec.*, 895 F.3d 449, 452 (6th Cir. 2018).

Fees awarded for unsuccessful breach-of-contract and unfair trade practice claims are a major source of heartburn for Bosal. But the district court was permitted to do so because there is no reasonable basis for segregating the time expended on them. *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 130 (2d Cir. 2004) (interpreting Connecticut law). To the contrary, the claims were intertwined because they all arose from a single contract premised on the same dispute. *Cf. Jacques All Trades Corp. v. Brown*, 752 A.2d 1098, 1105 (Conn. App. Ct. 2000) (denying attorneys' fees for an unsuccessful breach-of-contract claim where the unfair trade practices claim related to a different contract).

For its part, Powdered Metal complains of reductions in the hourly attorney rates and total fee amount. But the district court acted well within its discretion. In reducing rates for out-of-district attorneys, the district court balanced a set of competing presumptions—that the prevailing district rate and the higher rate paid by Powdered Metal are reasonable—against relevant factors under Connecticut law, including the lack of difficulty in the issues presented. *See Romag Fasteners, Inc. v. Fossil, Inc.*, 2015 WL 5787019, at *2-3 (D. Conn. Sept. 30, 2015), *vacated in part on other grounds*, 866 F.3d 1330 (Fed. Cir. 2017); *Steiger v. J.S. Builders, Inc.*, 663 A.2d 432, 435-36 (Conn. App. Ct. 1995). It was reasonable for the district court to then reduce the total fee amount by twenty percent, rather than parse the billing records for unrecoverable fees. Powdered Metal failed to exclude fees that even it agreed were not recoverable. It is not the role of the district court to serve as its green-eyeshade accountant. *Fox v. Vice*, 563 U.S. 826, 838 (2011).

Powdered Metal has no shortage of complaints. It challenges numerous other aspects of the fee award, including fees for paralegals, litigation support staff, and work on this appeal, in addition to fees for a discovery sanction. We find no abuse of discretion in the district court's reasoned determination of the fees within these categories.

## D. Postjudgment Interest

We agree with both parties that the district court made a mistake of law in calculating postjudgment interest on damages flowing from Powdered Metal's separate breach-of-contract claim according to Connecticut's statutory rate of ten percent. In diversity cases, federal law

controls postjudgment interest under 28 U.S.C. § 1961. *Estate of Riddle ex rel. Riddle v. S. Farm Bureau Life Ins. Co.*, 421 F.3d 400, 409 (6th Cir. 2005). Interest shall be calculated from the date of the judgment according to the weekly average one-year constant maturity Treasury yield for the preceding calendar week. 28 U.S.C. § 1961(a).

## III. CONCLUSION

We affirm in part and reverse in part the judgment of the district court.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

LARSEN, Circuit Judge, concurring in part and dissenting in part. I agree with the majority that the district court erred in applying Connecticut's statutory postjudgment interest rate rather than the federal rate required under 28 U.S.C. § 1961. I also agree that the Connecticut Unfair Trade Practices Act (CUTPA) applies to Powdered Metal's unfair trade practices claim. But I do not think the district court made findings sufficient for us to review its decision that Bosal violated CUTPA. I would vacate that part of the opinion and remand the case for the district court to reconsider the issue and provide more detailed findings.

The district court correctly noted that a CUTPA violation requires: (1) an unfair or deceptive act or practice; (2) an ascertainable loss; and (3) causation. Conn. Gen. Stat. § 42-110(g)(a). Unsurprisingly, "not every contractual breach rises to the level of a CUTPA violation." *Naples v. Keystone Bldg. & Dev. Corp.*, 990 A.2d 326, 337 (Conn. 2010) (quotation omitted). Instead, liability lies where there is a breach plus some other aggravating circumstance. *See Ulbrich v. Groth*, 78 A.3d 76, 101 (Conn. 2013). The Connecticut Supreme Court has explained: "CUTPA was intended to provide a remedy that is separate and distinct from the remedies provided by contract law when the defendant's contractual breach was accompanied by aggravating circumstances." *Id.*

In my view, the district court did not make findings sufficient to support its determination that Bosal violated CUTPA. The entirety of the district court's analysis regarding the CUTPA violation—a single paragraph—stated:

> Admittedly, aggressive business tactics do not necessarily equal an unfair trade practice. In this case, Bosal's pattern of troubling conduct—for example, its unilateral demands and belligerent posturing regarding the ramp-up and accelerated production—culminated in its wrongful termination of the flange contract. This Court concludes Bosal's actions in terminating the contract rise to the level of unfair conduct. This is highlighted by the two-month delay in notifying [Powdered Metal] that Bosal had switched to a different flange supplier, thus allowing [Powdered Metal] to believe Bosal planned to fulfill the contract. Bosal's actions were clearly misleading and intentional. Because of Bosal's

action, [Powdered Metal] was deprived of the remaining value of the flange contract, and it was also prevented from supplementing its business with new orders from other customers.

*Bosal Indus.-Georgia v. PM Engineered Solutions, Inc.*, No. 3:14 CV 2635, 2016 WL 6216140, at \*8 (N.D. Ohio Oct. 25, 2016).

I agree with the majority that we owe deference to the district court's factual findings, especially where, as here, the court held a five-day bench trial in a complex case. *See Byrne v. United States*, 857 F.3d 319, 326 (6th Cir. 2017). But a close examination of the district court's analysis does not support its conclusion that Bosal's tactics amounted to unfair or deceptive trade practices. Although the district court referenced Bosal's "pattern of troubling conduct" regarding the ramped-up production schedule, the district court had previously concluded, regarding that same conduct, that while it "acknowledge[d] Bosal's aggressive tactics," it did "not find Bosal improperly intimidated [Powdered Metal]." *Bosal Indus.-Georgia*, 2016 WL 6216140, at \*7. The court found that Powdered Metal had "presented no evidence that Bosal threatened any 'illicit action' if [Powdered Metal] refused to comply with its demands, but instead warned [Powdered Metal] that it (and possibly DMAX or GM) would go after [Powdered Metal] with charge-backs or litigation." *Id.* Finding no "duress" or "improper[] intimidat[ion]," the district court found that Powdered Metal "chose to stick it out and continue production." *Id.* If the district court did not believe that Bosal's actions leading up to the termination were improper and also found that Powdered Metal had agreed to operate under the ramped-up production schedule, how then do these actions support a finding of an unfair or deceptive trade act? The district court did not explain.

The only other "troubling conduct" the district court referenced was that, for two months, Bosal failed to notify Powdered Metal that it had switched to a different supplier. But failing to provide reasonable notice was the breach itself. *See id.* And a CUTPA violation requires a breach plus aggravating circumstances. *See Ulbrich*, 78 A.3d at 101; *see also Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1038 (2nd Cir. 1995) ("[A] simple breach of contract does not offend traditional notions of fairness . . . [and] therefore did not violate CUTPA.") (collecting cases). The district court had to identify some aggravating behavior—*beyond* its

breach of the contract—to find that Bosal violated CUTPA, but none appears. Although the district court concluded that Bosal took some unidentified "actions" that were "clearly misleading and intentional," it failed to explain what they were or how they misled.

The majority suggests three ways in which Bosal might have "intentionally misled Powdered Metal into believing that it planned to fulfill the contract." First, the majority states that Bosal "accept[ed] additional flanges from Powdered Metal" even after it had decided to switch suppliers. Even accepting this as true,[1] where the breach consists of failure to provide "reasonable notice" of termination of an at-will contract, it will always be the case that the breaching party will have continued to behave, until notice is given, as if the contract would be ongoing. That is the breach; something more is required for that breach to become an unfair trade practice.

Second, the majority faults Powdered Metal for communicating its "'continued support to return to a normalized situation where we can fill the pipeline,' all the while knowing that it had already decided to switch suppliers." But the district court never found that this statement was false or misleading. Indeed, the district court's opinion does not reference this statement at all. And it is not even clear that the statement was made after Powdered Metal had decided to terminate the contract. The email the majority references was sent on October 6, 2014, but the

---

[1]It is not clear that the district court actually found that Powdered Metal accepted additional flanges after it had decided to switch suppliers. In determining that Bosal had breached the contract, the district court stated:

> Bosal decided to terminate the contract and switch to another flange supplier in mid October 2014 after purchasing roughly 34,000 flanges. It provided [Powdered Metal] no notice of any alleged breach at that time. The only possible documented notice of breach that Bosal provided, at any time, was its SCAR reports, dated July and September 2014. But Bosal continued to order and accept additional flanges even after this point. The SCAR reports included no suggestion that Bosal intended to end its contractual relationship with [Powdered Metal].

*Bosal Indus.-Georgia*, 2016 WL 6216140 at *7. The most natural reading of this passage is that Bosal "continued to order and accept additional flanges even after" the July and September 2014 SCAR reports, not after it had "decided to terminate the contract and switch to another flange supplier in mid October." At a minimum, the passage does not clearly indicate that the district court found the latter. The district court found as a fact that "Bosal last ordered flanges from PMES in October 2014, before the testing was completed." *Id.* at *4. As record support for this finding, the district court cited testimony referring to an October 13 email, which asked Powdered Metal "to immediately stop machining" and to "confirm when the new batch of material is due to arrive." Even if this email indicates a new order, rather than an inquiry about an existing order, October 13 is not clearly *after* PMES decided to switch suppliers in mid-October. At best the timeline is uncertain, and I would remand for the district court to clarify.

district court found that "Bosal decided to terminate the contract and switch to another flange supplier in mid October." *Id.* at \*7. At the very least, the timing is unclear, and it should be for the district court to clarify.

Finally, the majority suggests that Bosal lied when it "indicated that it was halting production not because of its decision made by that time to terminate the contract, but 'due to the ongoing root cause analysis.'" But, again, the district court did not find that Bosal's statement was false. As to timing, the email referenced here was sent on October 14, 2014, which is not clearly after Bosal's decision to terminate the contract, made, according to the district court, "in mid October." *Id.* And the district court made no findings that the root cause analysis, which everyone concedes actually took place, was somehow a sham.

In sum, each of the majority's three attempts to fortify the district court's unexplained finding of a CUTPA violation falls short. The district court found that "Bosal decided to terminate the contract and switch to another flange supplier in mid October," *id.*, but none of the "intentionally mis[leading]" actions identified by the majority clearly took place after that date. The most that can be said in support of the verdict is that the record is unclear. I would accordingly vacate that portion of the district court's opinion and remand for the district court to take another look.

The majority does not believe a remand is necessary. Instead, the majority concludes that "an internal email suggests that Bosal decided to switch suppliers as early as September 19, 2014 and had reached an agreement with a new supplier (SSI) by October 3, 2014." In other words, the majority reasons, the CUTPA violation can be sustained because, on its own reading of the record, Bosal had decided to switch suppliers in mid September, or early October. There is just one problem: that is not what the district court found. The district court found that Bosal decided to switch suppliers "in mid October."[2] The majority does not conclude that this finding was clearly erroneous. But, in order to sustain the district court's ultimate conclusion of a CUTPA violation, the majority substitutes its *own* findings of fact for those of the district court.

---

[2]In one part of the opinion, the district court had stated that Bosal had decided to switch suppliers "*by* mid-October." *Id.* at \*5 (emphasis added). Later, the district court said that Bosal decided to terminate the contract "*in* mid-October." *Id.* at \*7 (emphasis added). Any ambiguity is just more reason to allow the district court to clarify.

The majority sustains the CUTPA violation by concluding that Bosal had arrived at a final decision to switch suppliers earlier than the district court found.  But the evidence the majority cites does not require that conclusion.  The September 19 email shows only that Bosal had concerns about Powdered Metal as a supplier and that at least one person was of the opinion they should switch suppliers or start a second source.  And while the October 3 email shows that Bosal was in serious talks with another supplier and wanted them to begin certain work, Bosal still clarified in that email what would happen in the event Bosal cancelled this work, suggesting that this new supplier relationship may not have been concrete.  All the October 3 email definitively shows is what the district court said regarding this same email, that "Bosal was exploring its options with other suppliers," *id.* at *4, which surely is not always the same as having reached a final decision to terminate an at-will contract.  I do not dispute that, at least the October 3 email *could* support the finding the majority makes—but it most certainly does not compel it.  And so, I do not believe these emails can sustain the majority's implicit conclusion that the trial court's mid-October date was clearly in error.

Here the district court's conclusory finding that Bosal's actions were "misleading and intentional" is insufficient.  I would vacate and remand for the district court to identify which statements or actions rose to this level and to explain why, and so I respectfully dissent.  Because I would vacate the district court's determination that Bosal violated CUTPA, I would also vacate the district court's award of attorney's fees under CUTPA pending its resolution of that claim.