STATE OF CONNECTICUT *v.* DAVID L. COPAS
(SC 15759)

Norcott, Katz, Palmer, Sullivan and Callahan, Js.

---

Argued September 29, 1999—officially released March 14, 2000

*Elizabeth M. Inkster*, assistant public defender, for the appellant (defendant).

*Judith Rossi*, executive assistant state's attorney, with whom, on the brief, was *Patricia A. Swords*, state's attorney, for the appellee (state).

PALMER, J. A jury found the defendant, David L. Copas, guilty of murder in violation of General Statutes § 53a-54a (a).[1] The trial court rendered judgment in accordance with the jury verdict and sentenced the defendant to a prison term of sixty years. On appeal,[2] the defendant claims that the trial court improperly: (1) permitted the state to elicit a certain statement during its examination of two expert psychiatric witnesses; (2) denied the defendant's motions for a mistrial and a new trial based on allegedly improper comments that the prosecutor had made during her closing argument; and (3) instructed the jury on reasonable doubt and the presumption of innocence. We reject the defendant's claims and, consequently, affirm his conviction.[3]

The jury reasonably could have found the following facts. On Friday evening, April 25, 1986, the sixteen

[1] General Statutes § 53a-54a provides in relevant part: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

Public Acts 1992, No. 92-260, § 26, amended subsection (c) of § 53a-54a; this amendment is not relevant to this appeal. For convenience, we refer throughout this opinion to the current revision of § 53a-54a.

[2] The defendant appeals directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[3] This appeal marks the second time that we review a judgment of conviction rendered against the defendant, predicated upon the same underlying facts. In 1986, the defendant pleaded guilty to the murder that is the subject of this appeal. Thereafter, the defendant filed a petition for a writ of habeas corpus alleging that he had been denied the effective assistance of counsel in connection with the entry of his guilty plea and that he therefore was entitled to withdraw his plea. The habeas court granted his petition, and we ultimately affirmed the judgment of the habeas court. *Copas* v. *Commissioner of Correction*, 234 Conn. 139, 167, 662 A.2d 718 (1995). This appeal arises from the verdict of guilty rendered by the jury following the defendant's subsequent murder trial.

year old victim, Laura Bieu, and two friends, Katherine Harakaly and Sherry Roy, hitchhiked to the Lucky Strike bowling alley in Mansfield, where they played pinball and socialized.[4] As the three girls were preparing to leave the bowling alley at approximately 11 p.m., the defendant, whom the victim had met a couple of weeks earlier and knew slightly, agreed to give them a ride home. After unsuccessfully trying to purchase some marijuana at a nearby housing complex, the defendant drove to Harakaly's home in Ashford and dropped off Harakaly and Roy. The victim, who appeared to be frightened by the prospect of riding alone with the defendant, asked if she, too, could spend the night at Harakaly's house. Harakaly responded that her father would not allow it. Harakaly stated, however, that she would call the victim's home in one-half hour, believing that such a statement would assuage the victim's concerns by deterring the defendant from engaging in any inappropriate conduct with the victim.

On Sunday, April 27, 1996, the victim's body, bloody and partially covered by rocks, was found in a secluded, heavily wooded area near Hop River Road in Coventry. An autopsy revealed that she had been stabbed approximately twenty times and that she had suffered multiple blunt force injuries. The victim died as a result of a deep stab wound that had punctured her left lung and blunt force trauma to her head. According to expert testimony, the victim lived for approximately thirty minutes after sustaining these injuries.

During the course of its investigation into the victim's disappearance, the Coventry police interviewed the defendant. He told them that he had dropped the victim off at her grandmother's home at about 1 a.m. on Satur-

---

[1] The victim bought a cup of orange juice at the bowling alley and added a small quantity of vodka from a nearly empty one-half pint bottle that the victim had in her purse. The three girls shared the mixed drink in the restroom.

day morning and that he had not seen her since that time. Thereafter, the police obtained search warrants for the defendant's car, residence and person. Upon being taken to the Coventry police department for execution of the warrant for his person, the defendant confessed to killing the victim. Specifically, the defendant admitted that, after having sexual intercourse with the victim,[5] he stabbed her repeatedly in the head, torso and legs,[6] and struck her in the head with a rock.[7] As the victim lay dying, the defendant took a necklace from her and removed $13 from her purse. Additional facts will be provided as necessary.

## I

The defendant first claims that he is entitled to a new trial because the trial court improperly permitted the state, during its examination of two expert witnesses, to elicit testimony from those witnesses regarding a certain statement that the defendant had made to Michelle Veilleux, the defendant's roommate. We disagree.

The following additional facts are relevant to our determination of the defendant's first claim. At trial, the defendant did not deny killing the victim, but asserted the affirmative defense of extreme emotional

[5] The defendant stated that his sexual encounter with the victim was consensual.

[6] The police found a knife that belonged to the defendant's brother-in-law in the wooded area near the victim's body. In the same area, the police also found a turquoise ring that had been given to the defendant by his wife.

[7] The defendant also told the police that he and the victim drove to Hop River Road after engaging in sexual intercourse. According to the defendant, the victim, suddenly and without any apparent provocation, attacked him with a knife, screaming that he was "diseased" and that he had infected her. The defendant claimed that he wrested the knife away from the victim and then stabbed her repeatedly with it. The defendant also told the police that, after the victim had fallen to the ground, he struck her in the head with a rock. The defendant further stated that, because the victim still was alive, he kicked her and continued to strike her in the head with rocks.

disturbance.[8] In support of his defense, the defendant presented the testimony of Walter Borden, a psychiatrist, who stated that the defendant suffered from "borderline personality" disorder, and had killed the victim in a "reactive rage" after the victim had attacked him with a knife.[9] According to Borden, the defendant did not kill the victim with premeditation or forethought, but, rather, exploded with anger when the victim assaulted him.[10]

On cross-examination, the state sought to discredit Borden's testimony that the defendant had acted under the influence of an extreme emotional disturbance when he killed the victim. Specifically, the state questioned Borden about a statement that the defendant had made to Veilleux, who reiterated the statement to Borden during an interview that Borden had conducted with Veilleux in connection with his psychiatric evaluation of the defendant.[11] Borden testified that Veilleux had told him that, one week prior to the victim's death, the defendant, Veilleux and a third person, Phillip Tardif, were smoking marijuana together in the area of Hop River Road where the victim's body later was found.

---

[8] General Statutes § 53a-54a provides in relevant part: "Murder. (a) . . . [I]n any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be . . . ."

Extreme emotional disturbance is "a mitigating circumstance which will reduce the crime of murder to manslaughter." *State* v. *Asherman*, 193 Conn. 695, 730–31, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). As with other affirmative defenses, the defendant has the burden of proving extreme emotional disturbance by a preponderance of the evidence. General Statutes § 53a-12.

[9] The defendant also adduced testimony in support of his defense of extreme emotional disturbance from Julia Ramos-Grenier, a clinical psychologist specializing in forensic neuropsychology.

[10] The defendant did not testify at trial.

[11] Neither party called Veilleux to testify at trial.

Borden further testified that Veilleux stated that, at that time, the defendant had remarked to Veilleux that the Hop River Road location "would be a good place to rape you, kill you, leave you, and . . . no one would ever find you."[12]

The defendant raised a timely objection to the state's inquiry, claiming that Borden's testimony regarding the defendant's comment to Veilleux was irrelevant and, even if relevant, that its prejudicial effect outweighed its probative value. The state responded that the statement was relevant to the credibility of Borden's opinion that the defendant had killed the victim in a reactive rage. The trial court overruled the defendant's objection, concluding that the probative value of the challenged statement was "very high" and that any possible prejudicial effect of the evidence was "far outweighed by [its] probative value . . . ."

At the conclusion of the state's cross-examination of Borden on this issue, the trial court instructed the jury not to consider the challenged statement as substantive evidence, but, rather, solely for the purpose of evaluating the validity of Borden's opinion.[13] Finally, on redirect

---

[12] Borden also testified that he had questioned the defendant about the statement that the defendant allegedly had made to Veilleux at Hop River Road one week before the victim's death. According to Borden, the defendant claimed that he did not recall being at that location with Veilleux or making any such statement.

[13] The trial court instructed the jury: "Ladies and gentlemen, I'm going to give you now what is called a limiting instruction, which means [that] the testimony you've just heard is to be taken by you only on a certain basis. You're not to consider the statement, talking now about the statement that was made by the defendant to [Veilleux] on Hop River Road a week before the homicide. And you heard the statement. Now, you're not to consider the statement made by the defendant as a threat or an intent to do harm. In particular, you should disregard the statement about rape because, in this case, the defendant has not been charged with rape. The state has offered this testimony only to rebut Doctor Borden's testimony or opinion that this was a reactive homicide and that, I may be paraphrasing here, but that the defendant did not, at least at the time of the—when the—when they arrived at Hop River Road, the time of the murder, he had no preconceived thoughts or feelings to kill [the victim]. I'm not sure that was his exact

examination, Borden testified that Veilleux had told him that she had "laughed . . . off" the defendant's statement because it was not uncommon for men in her circle of friends to express themselves in such a manner, especially when they were drinking or using drugs.[14]

Subsequently, Peter Zeman, a psychiatrist, testified as a rebuttal witness for the state. Zeman disagreed with Borden's conclusion that the defendant had killed the victim in a reactive rage. Zeman concluded that the defendant had antisocial and narcissistic personality features, and that his attack of the victim was the product of those personality traits. Zeman disagreed with Borden's opinion that the killing was outside the normal course of behavior for the defendant. Zeman cited the defendant's comment to Veilleux about killing and raping her as evidence of the defendant's irritability and aggressiveness, traits that suggest that the defendant had killed the victim in conformity with an antisocial personality disorder rather than under the influence of an extreme emotional disturbance. At the defendant's

wording, but that was the gist of it. It is being offered as rebuttal to all of that, in effect, by showing that the defendant was aware of the possibility of killing someone at that location. Even though he didn't necessarily have the intent to do it at that time, he knew about it, and he mentioned it as you heard described, so this has nothing to do with guilt or innocence on the charge of murder. It does [go] to his state of mind as described by Doctor Borden, and the state has rebutted it with this evidence. Whether or not that was successful rebuttal is going to be for you to decide when you start the deliberations."

[14] On direct examination, Borden identified the various factors that he had considered in reaching his opinion that the defendant had killed the defendant in a fit of reactive rage. During direct examination, however, Borden did not mention the statement that Veilleux had made to him regarding the defendant's comment to her. After Borden had acknowledged, on cross-examination, that he was aware of the defendant's statement to Veilleux, the defendant, on redirect examination, elicited testimony from Borden about Veilleux's reaction to the defendant's statement for the purpose of explaining why Borden had discounted the significance of that statement in formulating his opinion regarding the defendant's mental state.

request, the trial court instructed the jury to consider Zeman's testimony regarding the defendant's statement not for the statement's truth, but only insofar as the statement constituted a basis for Zeman's opinion.[15]

On appeal, the defendant renews the claims that he had raised in the trial court. "As a threshold matter, we set forth the standard by which this court reviews a challenge to a trial court's [evidentiary ruling]. The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Berger*, 249 Conn. 218, 229, 733 A.2d 156 (1999).

We first address the question of whether the defendant's statement to Veilleux was relevant to the testimony of Borden and Zeman. "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . [E]vidence need not exclude all other possibilities [to be relevant]; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . . [T]he fact that evidence is susceptible of different explanations or would support various inferences does not affect

---

[15] The trial court instructed: "These statements on which Doctor Zeman has relied would ordinarily be hearsay coming from other people who are not here to cross-examine and so on, and . . . the statements are not being offered for the truth of what's in the statement . . . but they are being offered to show the basis for the opinion, at least in part, the opinion that Doctor Zeman has rendered and will render. So they're as a basis for his opinion, but you're not to consider them for their necessarily being truthful allegations. They may be, they may not be, but don't consider them as true at this point, and just as a basis for . . . [Doctor Zeman's] opinion."

its admissibility, although it obviously bears upon its weight. So long as the evidence may reasonably be construed in such a manner that it would be relevant, it is admissible." (Internal quotation marks omitted.) *State* v. *Booth*, 250 Conn. 611, 645, 737 A.2d 404 (1999).

"A basic and proper purpose of cross-examination of an expert is to test that expert's credibility." *Hayes* v. *Manchester Memorial Hospital*, 38 Conn. App. 471, 475, 661 A.2d 123, cert. denied, 235 Conn. 922, 666 A.2d 1185 (1995); see also 1 C. McCormick, Evidence (5th Ed. 1999) § 13, pp. 65–66. Thus, "[i]t is well established that an expert witness can be examined concerning the factual basis of his [or her] opinion. *United States* v. *Madrid*, 673 F.2d 1114, 1120–21 (10th Cir.), cert. denied, 459 U.S. 843, 103 S. Ct. 96, 74 L. Ed. 2d 88 (1982) (defendant's statements during psychiatric examination admissible as basis for expert opinion); *Rollerson* v. *United States*, 343 F.2d 269, 271 (D.C. Cir. 1964); *State* v. *Douglas*, 203 Conn. 445, 452–53, 525 A.2d 101 (1987); *State* v. *Asherman*, 193 Conn. 695, 716–17, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985); *State* v. *Garcia*, [233 Kan. 589, 599, 664 P.2d 1343 (1983)]; 31A Am. Jur. 2d, Expert and Opinion Evidence § 75 [1989]." *State* v. *Steiger*, 218 Conn. 349, 372, 590 A.2d 408 (1991). Consequently, "[i]n cases [in which] the defendant places his [or her] mental status in issue, the basis for a psychiatric expert's opinion is one of the things that the trier of fact may consider in evaluating the testimony of that expert." Id.

In this case, the defendant placed his mental condition in issue by seeking to establish that he had killed the victim while he was under the influence of an extreme emotional disturbance. See *State* v. *Manfredi*, 213 Conn. 500, 513, 569 A.2d 506, cert. denied, 498 U.S. 818, 111 S. Ct. 62, 112 L. Ed. 2d 37 (1990); *State* v. *Fair*, 197 Conn. 106, 109, 496 A.2d 461 (1985), cert. denied, 475 U.S. 1096, 106 S. Ct. 1494, 89 L. Ed. 2d 895 (1986); *State*

v. *Lovelace*, 191 Conn. 545, 550–51, 469 A.2d 391 (1983),
cert. denied, 465 U.S. 1107, 104 S. Ct. 1613, 80 L. Ed.
2d 142 (1984). The defendant having done so, both he
and the state were entitled to, and did, adduce expert
psychiatric testimony regarding the defendant's mental
condition. Because Borden and Zeman testified that
they had considered information about the defendant
that they had gleaned from a variety of sources,[16] the
parties also were entitled to explore the reasons for the
experts' reliance, or lack thereof, on such information in
formulating their opinions about the defendant's mental
state. Although some of the facts considered by the
experts, such as the defendant's statement to Veilleux,
may not have been substantively admissible; see *State*
v. *Henry*, 27 Conn. App. 520, 529, 608 A.2d 696 (1992)
("[i]nformation on which an expert relied that is not
offered for its truth but is offered to show that the
expert relied on it is not hearsay and may be the subject
of proper cross-examination to test the basis of that
expert's opinion"); see also 2 C. McCormick, supra,
§ 324.3, p. 356 (under Fed. R. Evid. 703, facts relied on
by experts are admitted for "the limited purpose of
informing the jury of the basis of the expert's opinion
and therefore [the rule] does not constitute a true hear-
say exception"); the parties were not precluded from
examining the experts about those facts insofar as they
related to the basis for the experts' opinions.

The defendant argues that, because the challenged
line of questioning related to a statement by the defen-
dant to Veilleux regarding murder *and* rape, and
because there was no evidence to establish that the
defendant had sexually assaulted the victim, the state-

---

[16] Indeed, during his direct examination of Borden, the defendant elicited
testimony about certain incidents from the defendant's past that Borden
had learned from interviews he had conducted with the defendant's family
and friends for the purpose of assisting him in diagnosing the defendant's
mental condition.

ment was irrelevant to the defendant's mental state. For the reasons set forth hereinafter; see part II of this opinion; we reject the defendant's contention that the evidence does not support an inference that the defendant sexually assaulted the victim. Even if we were to assume, however, that the jury reasonably could not have inferred that the victim had been sexually assaulted, the defendant's argument fails because it misconstrues the state's purpose in questioning Borden and Zeman about the defendant's statement to Veilleux: the state elicited testimony about the statement not as substantive evidence of the defendant's guilt, but, rather, for the purpose of exploring the credibility of the experts' conclusions regarding the defendant's mental state. "The jury was entitled to consider the basis of the testimony of the expert witness. . . . It might consider also the reasonableness of his judgments about the underlying facts and of the conclusions which he drew from them." (Internal quotation marks omitted.) *State* v. *Raguseo*, 225 Conn. 114, 135–36, 622 A.2d 519 (1993). Because the challenged statement was relevant to the credibility of the basis for the experts' opinions regarding the issue of whether the defendant was acting under the influence of an extreme emotional disturbance when he killed the victim, the trial court properly concluded that the evidence adduced by the state concerning the defendant's statement to Veilleux was relevant.

We next address the issue of whether, despite the relevancy of the challenged statement, the trial court nevertheless should have excluded it as unduly prejudicial. "Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value." *Grayson* v. *Wofsey, Rosen, Kweskin & Kuriansky*, 231 Conn. 168, 193, 646 A.2d 195 (1994). Of course, "[a]ll adverse evidence is damaging to one's case, but it is

inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted." (Internal quotation marks omitted.) *State* v. *Woodson*, 227 Conn. 1, 17, 629 A.2d 386 (1993). "The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. . . . The trial court . . . must determine whether the adverse impact of the challenged evidence outweighs its probative value." (Citation omitted.) *State* v. *Crafts*, 226 Conn. 237, 255, 627 A.2d 877 (1993). Finally, "[t]he trial court's discretionary determination that the probative value of evidence is not outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Citation omitted; internal quotation marks omitted.) *State* v. *Bush*, 249 Conn. 423, 430, 735 A.2d 778 (1999).

We agree with the state that the trial court did not abuse its discretion in allowing the state to examine Borden and Zeman concerning the defendant's statement. For the reasons that we previously have articulated, the challenged statement was highly relevant to the issue of the credibility of the basis for the experts' opinions regarding the defendant's mental state at the time he killed the victim. Moreover, although the defendant's statement to Veilleux may be considered inflammatory when viewed out of context, Borden explained that Veilleux had told him that she had not taken the defendant's comment seriously because such talk was not uncommon among her circle of friends. Furthermore, the trial court properly instructed the jury that the statement was to be used solely for the purpose of

evaluating the basis for the experts' opinions, not as substantive evidence of the defendant's guilt. "It is to be presumed that the jury followed the court's . . . instructions unless the contrary appears." (Internal quotation marks omitted.) *State* v. *McIntyre*, 250 Conn. 526, 533, 737 A.2d 392 (1999). Accordingly, we conclude that the trial court did not abuse its broad discretion in permitting the state to question Borden and Zeman about the defendant's statement to Veilleux.

## II

The defendant also claims that certain comments that the prosecutor had made during closing arguments to the jury violated his due process right to a fair trial under the state and federal constitutions.[17] We disagree.

The following facts and procedural history are relevant to the defendant's claim of prosecutorial misconduct. At trial, the state adduced evidence that, during his confession to the police, the defendant stated that he had engaged in consensual sexual intercourse with the victim before he killed her. The defendant elicited testimony from Arkady Katsnelson, the state's associate medical examiner, and Borden, supporting the defendant's statement that sexual intercourse with the victim was consensual. Specifically, Katsnelson, who had performed an autopsy on the victim, testified that, although his examination of the victim's body revealed the presence of sperm in the victim's vagina, he "did not find any evidence of trauma to the [victim's] genitals," and noted that the victim was found with her jeans buttoned and in place. Borden testified that, based upon his review of Katsnelson's findings, there were no physical signs of a sexual assault.

[17] The defendant has not claimed that the due process clause of the state constitution; Conn. Const., art. I, § 8; affords him any greater protection than the due process clause of the federal constitution. U.S. Const., amend. XIV. Accordingly, for purposes of this opinion, we treat those provisions as affording the defendant the same level of protection.

In her closing argument, the prosecutor made the following comments: "Now, a word about motive. In a criminal case, the state is only required to prove the elements of the crime, and we are not required to prove what the defendant's motive is or was. The existence of motive, however, can go toward showing the defendant's intent, and the absence of motive may also go to a lack of intent.

"Motive, however, like intent, is a mental process and can only be discerned in two ways. Number one would be to look again into the defendant's mind, which, of course, we can't do, and, secondly, would be to look at his actions. We will never truly know why the defendant killed [the victim], but I can suggest to you that there are two very probable motives here.

"Number one is that the defendant sexually assaulted [the victim] and either then killed her to cover up his act or killed her because she threatened to report him to the police, to his wife or to her boyfriend.

"We can't prove conclusively . . . that she was sexually assaulted. Only two people know that, and only one is here to tell us. [The victim] is not here to tell us her version. Just because the defendant has claimed through his confession that the sex was consensual here doesn't make it so. We know that somebody can be sexually assaulted without the use of force. The threat of force or of overpowering . . . someone can constitute a sexual assault.

"I submit to you that the defendant's claim that the sex was consensual is as believable as his claim that the victim attacked him with a knife, his claim that John Naumec gave him marijuana that night,[18] his claim

---

[18] After the defendant had stabbed and beaten the victim, he returned to his car but could not start it. John Naumec, an elderly man who lived on Route 6 in Columbia, allowed the defendant to use his telephone to summon assistance for the car. The defendant then called Tardif, his friend, and arranged to meet him at a nearby intersection. In one of the defendant's

he dropped [the victim] off at the grandparents' house, which he told . . . Tardif and Detective [Michael] Malchik, and finally his claim that he was attacked by a dog that evening, which he told to . . . Tardif, [Joseph] and Dawn Efter and Ralph Blumenhagen and Kevin McCall."[19]

"[A] [s]econd probable [scenario] is that the defendant may have killed the victim to steal her $100.[20] We know from testimony of Cathy Hoskins[21] that the defendant had not been working. He worked one day in the week prior to the murder and had not worked for three weeks prior to that. The family didn't even have the money to buy groceries or keep the electricity on. The defendant even let [the victim] pay for his gas that night as he told us in the confession.

"We also know that, according to the defendant, he rifled [through] the victim's purse, and he took anything of value that he [could] find. There, he stole . . . $13 and the necklace which he gave later to [Hoskins]. The only thing that the state police found out there on Hop River Road were items of insignificance or no value: cosmetics belonging to the . . . victim, her purse, her key ring, deodorant, etc.

"Did the defendant rifle [through] her purse hoping to find that $100? Sure. If he had found it, would he have taken it? Absolutely. I don't think there's any question about that. You'll recall that the defendant claims,

statements to the police, he had indicated that Naumec had provided him with some marijuana.

[19] The state had adduced testimony establishing that Joseph Efter, Dawn Efter, Blumenhagen and McCall had seen the defendant waiting on Route 6 for Tardif to arrive. The defendant explained to them, and thereafter to Tardif, that his disheveled appearance was due to the fact that he had been attacked by a dog.

[20] Upon discovering the victim's body, the police found a $100 bill in the victim's pants pocket.

[21] Hoskins is the defendant's ex-wife. She was married to the defendant at the time of the killing.

in speaking to the psychiatrists, that [the victim] had pulled $100 out of her pocket, thereby implying that he knew $100 was in her pocket. Well, I ask you to take a look at the confession because the confession doesn't say he knew $100 came from her pocket, and, as we know from the defendant, Doctor [Julia Ramos-Grenier] has the police report here and other documents in an effort to make his story better in the ten years since the crime, so stealing $100, yes, that's a very probable motive for killing the victim."

At the conclusion of the prosecutor's closing argument, the defendant moved for a mistrial. Specifically, he claimed that there was nothing in the record to indicate that the victim had been sexually assaulted and, consequently, that the prosecutor, in asserting that the defendant may have been motivated to kill the victim to cover up a sexual assault, impermissibly invited the jury to speculate on facts not in evidence.[22] The trial court denied the defendant's motion for a mistrial, concluding that the prosecutor's argument was proper because the evidence supported an inference that the defendant's sexual encounter with the victim was not consensual.[23]

During defense counsel's closing argument, he pointed out that the state had failed to elicit any evidence to suggest that the victim had been sexually assaulted. Defense counsel further stated that, in the absence of such evidence, the jury could not infer that the defendant had been motivated to kill the victim to conceal a sexual assault.[24]

---

[22] The defendant does not challenge the propriety of the prosecutor's claim that the defendant's motive in killing the victim may have been to steal her money.

[23] The defendant did not request that the trial court give a curative instruction to the jury.

[24] Defense counsel stated: "They had consensual sex, and I know that the state has argued there's a motive here. Well, that's another thing I've considered and ask you to consider. Is there a motive for this killing? No, there's not a motive. If you think there was a sexual assault, look at the

In its charge to the jury immediately following closing arguments, the trial court instructed the jury that such arguments were not evidence and, furthermore, that the jurors' recollection of the facts, rather than that of the court or counsel, was controlling.[25]

After the jury returned a verdict of guilty, the defendant filed a motion for a new trial claiming, inter alia, that he had been deprived of a fair trial by virtue of the prosecutor's comment that the defendant may have killed the victim to conceal a sexual assault. The court denied the defendant's motion.[26] Additional facts will be set forth as necessary.

On appeal, the defendant renews his claim that there was no evidence to indicate that the defendant had sexually assaulted the victim and, consequently, that the prosecutor's comment that the defendant may have been motivated to kill the victim to cover up a sexual

evidence. The evidence from the state's own expert, Doctor Katsnelson. The evidence is the pants were buttoned, zipped and buttoned up. There was an examination by . . . Katsnelson . . . . There was no trauma or injury to the genitalia or to the private area of [the victim]. There was no physical evidence of a sexual assault."

[25] The trial court instructed the jury in relevant part: "You should . . . keep in mind that arguments and statements by the attorneys in final arguments or during the course of the case are not evidence. You should not consider as evidence their recollection of the evidence nor their personal belief as to any facts or as to the credibility of any witness, nor any facts which any attorney may have presented to you in argument from that attorney's knowledge which was not presented to you as evidence during the course of the trial, although we don't think that happened. Furthermore, I emphasize to you that, if there is any difference between what any attorney recalls as the evidence or what I recall as the evidence, and what you recall as the evidence, it is your recollection that controls your recollection and not anybody else's."

[26] The trial court heard extensive argument on the defendant's motion for a new trial. The court expressly concluded that the evidence supported an inference that the victim was sexually assaulted. The trial court also determined that, even if the challenged comment was improper, the comment did not deprive the defendant of his due process right to a fair trial.

assault was improper.[27] The defendant further claims that the prosecutor's remarks so undermined his affirmative defense of extreme emotional disturbance as to constitute a violation of his due process right to a fair trial. We conclude that the prosecutor's remarks were not improper.

"We have previously acknowledged that prosecutorial misconduct can occur in the course of closing argument." *State* v. *Atkinson*, 235 Conn. 748, 768–69, 670 A.2d 276 (1996); accord *State* v. *Andrews*, 248 Conn. 1, 18–19, 726 A.2d 104 (1999); *State* v. *Satchwell*, 244 Conn. 547, 564, 710 A.2d 1348 (1998). When presenting closing arguments, as in all facets of a criminal trial, the prosecutor, as a representative of the state, has a duty of fairness that exceeds that of other advocates. "[A] prosecutor is not an ordinary advocate. His [or her] duty is to see that justice is done and to refrain from improper methods calculated to produce prejudice and wrongful decisions by the jury. . . . [B]y reason of his [or her] office, [a prosecutor] usually exercises great influence upon jurors. His [or her] conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because [a prosecutor] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment." (Internal quotation marks omitted.) *State* v. *Satchwell*, supra, 568.

Consequently, "[w]hile a prosecutor may argue the state's case forcefully, such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." *State* v. *Bova*, 240

[27] We note that the defendant challenges the propriety of the prosecutor's comment regarding motive only on the ground that the evidence does not support an inference that the victim was sexually assaulted. The defendant does not dispute the fact that, if the evidence supports an inference that the victim was sexually assaulted, the jury reasonably could have concluded that the defendant killed the victim in an attempt to conceal that assault.

Conn. 210, 243, 690 A.2d 1370 (1997). Thus, "the privilege of counsel in addressing the jury . . . must never be used as a license to state, or to comment upon, or even to suggest an inference from, facts not in evidence, or to present matters which the jury [has] no right to consider." (Internal quotation marks omitted.) *State* v. *Satchwell,* supra, 244 Conn. 568; see also *State* v. *Pouncey,* 241 Conn. 802, 811, 699 A.2d 901 (1997) ("a prosecutor should avoid arguments [that] are calculated to influence the passions or prejudices of the jury, or [that] would . . . [divert] the jury's attention from [its] duty to decide the case on the evidence" [internal quotation marks omitted]); *State* v. *Bova,* supra, 243–44 (same). Nevertheless, "[i]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Andrews,* supra, 248 Conn. 19. Thus, "the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered . . . ." *State* v. *Pouncey,* supra, 811. Ultimately, therefore, the proper scope of closing argument "lies within the sound discretion of the trial court." *State* v. *Prioleau,* 235 Conn. 274, 320, 664 A.2d 743 (1995).

Before reviewing the evidence relating to the defendant's claim of prosecutorial impropriety, we note, first, that "[m]otive is not an element of the crime charged [and, therefore] . . . [p]roof of motive is never necessary to support a conclusion of guilt otherwise sufficiently established, however significant its presence or absence, or its sufficiency, may be as bearing upon the issue of guilt or innocence." (Citation omitted; internal quotation marks omitted.) *State* v. *Ruffin,* 206 Conn. 678, 681, 539 A.2d 144 (1988); accord *State* v. *Joyce,* 243 Conn. 282, 299, 705 A.2d 181 (1997), cert. denied,

523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998); *State* v. *Annunziato*, 169 Conn. 517, 530, 363 A.2d 1011 (1975). Thus, "if the state offers evidence regarding motive, it need not be proven beyond a reasonable doubt." *State* v. *Joyce*, supra, 299. Moreover, "[b]ecause it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually prove[n] by circumstantial evidence . . . ." (Citation omitted.) *State* v. *Rodriguez*, 180 Conn. 382, 404, 429 A.2d 919 (1980); see also *State* v. *Salz*, 226 Conn. 20, 32, 627 A.2d 862 (1993). Thus, motive, like intent, generally is inferred from the circumstances. See, e.g., *State* v. *Buonomo*, 88 Conn. 177, 184, 90 A. 225 (1914) ("Motive is a fact which may be inferred from circumstances; hence the circumstances from which it may be inferred are relevant. In the case of a homicide, the relations of the parties, including all of the circumstances which have gathered about their lives, furnish a most natural and suggestive field of inquiry in the search for possible motives prompting the deed."). Furthermore, the law makes no distinction between direct and circumstantial evidence so far as probative force is concerned. *State* v. *DeJesus*, 236 Conn. 189, 200, 672 A.2d 488 (1996); *State* v. *Sauris*, 227 Conn. 389, 399, 631 A.2d 238 (1993).

In addition, it is a function of the jury "to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Sivri*, 231 Conn. 115, 132–33, 646 A.2d 169 (1994). Because "[t]he only kind of an inference recognized by the law is a reasonable one"; (internal quotation marks omitted) *State* v. *Tatem*, 194 Conn. 594, 598, 483 A.2d 1087 (1984); "any such inference cannot be based on possibilities, surmise or conjecture." Id. It is axiomatic, therefore, that "[a]ny [inference] drawn must be rational and

founded upon the evidence." *State* v. *Weinberg*, 215 Conn. 231, 255, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990). However, "[t]he line between permissible inference and impermissible speculation is not always easy to discern. When we 'infer,' we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is 'reasonable.' But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it 'speculation.' When that point is reached is, frankly, a matter of judgment."[28] *Goldhirsh Group, Inc.* v. *Alpert*, 107 F.3d 105, 108 (2d Cir. 1997).

"[P]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable

[28] "Referring specifically to legal reasoning, it has been noted that [t]rust in inference is simply the belief that if there is a firm basis for the starting point the derived judgment is acceptable. The difference between speculation and inference lies in the substantiality of the evidence constituting the premise. Inductive reasoning claims the premises constitute some evidence for the conclusions and in law we speak in terms of the probability and likelihood that the premises buttress the conclusions. . . .

"Thus, inference and speculation are not different processes, but labels attached to the same process, and used to describe a level of certainty we have in a conclusion based on the quantity and quality of the facts from which that conclusion is drawn. In law (as elsewhere), this level of certainty derives, as discussed, from (1) the strength of our belief that the facts supporting the conclusion are true; and (2) the weight of the correlation between the facts and the conclusion." (Citation omitted; internal quotation marks omitted.) *Goldhirsh Group, Inc.* v. *Alpert*, 107 F.3d 105, 108 (2d Cir. 1997).

belief in the probability of the existence of the material fact." (Internal quotation marks omitted.) *Service Road Corp.* v. *Quinn*, 241 Conn. 630, 641, 698 A.2d 258 (1997); accord *Pierce* v. *Albanese*, 144 Conn. 241, 256, 129 A.2d 606, appeal dismissed, 355 U.S. 15, 78 S. Ct. 36, 2 L. Ed. 2d 21 (1957). Thus, in determining whether the evidence supports a particular inference, we ask whether that inference is "so unreasonable as to be unjustifiable." (Internal quotation marks omitted.) *State* v. *Ford*, 230 Conn. 686, 692, 646 A.2d 147 (1994). In other words, an inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference. "Equally well established is our holding that a jury may draw factual inferences on the basis of already inferred facts." *State* v. *Crafts*, supra, 226 Conn. 244. Moreover, "[i]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence." (Internal quotation marks omitted.) *State* v. *Stanley*, 223 Conn. 674, 681, 613 A.2d 788 (1992).

Finally, "we must review the comments complained of in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Andrews*, supra, 248 Conn. 19. Furthermore, "[t]he court, as a result of its familiarity with the context in which the prosecutor's remarks were made, was in a favorable position to evaluate the nature of these remarks. . . . Therefore, its determination that the prosecutor's remarks did not require a mistrial must be afforded great weight." (Citation omitted.) *State* v. *Ruscoe*, 212 Conn. 223, 248–49, 563 A.2d 267 (1989), cert. denied, 493 U.S. 1084, 110 S. Ct. 1144, 107 L. Ed. 2d 1049 (1990). With these principles in mind, we turn to the merits of the defendant's claim.

We conclude that the evidence adduced at trial was sufficient to permit an inference that the defendant

killed the victim to conceal a sexual assault. Preliminarily, we note that it is undisputed that the defendant killed the victim and engaged in sexual intercourse with her shortly before doing so. Furthermore, although there was no evidence establishing that the defendant had used *physical* force to compel the victim to engage in sexual relations with him, the defendant could have committed a sexual assault against the victim by compelling her to have sexual intercourse with him *by the threat of use of physical force.* See General Statutes § 53a-70.[29] The question, therefore, is whether, under all of the circumstances, the evidence warranted an inference that the defendant compelled the victim to have sexual intercourse with him. We are persuaded that it did.

First, the jury heard testimony that the victim, who was only sixteen years old, was frightened to ride home alone late Friday night with the twenty-five year old defendant, who was eight inches taller and fifty pounds heavier than the victim. Indeed, the victim asked Harakaly if she could stay overnight at her home to avoid having to travel alone in the car with the defendant, whom the victim barely knew. Only after Harakaly indicated that it would not be possible for the victim to stay overnight did the victim reluctantly remain in the car and continue on with defendant, who, at that point, appeared to be her only available means of transportation. In such circumstances, it would not have been unreasonable for the jury to have concluded that the victim likely would not have accompanied the defendant willingly to an isolated location on Hop River Road, let alone that she willingly would have engaged in sexual intercourse with him.

[29] General Statutes § 53a-70 provides in relevant part: "Sexual assault in the first degree . . . . (a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person . . . or by the threat of use of force against such other person . . . ."

The jury also heard expert psychiatric testimony from Zeman indicating that the defendant suffered from an antisocial and narcissistic personality disorder marked by aggressiveness, repeated assaults and physical cruelty. According to Zeman, the defendant often bullied, threatened and intimidated other people, frequently initiating physical confrontations. In addition, Zeman testified that the defendant suffered from a distorted sense of entitlement, did not believe that he was required to conduct himself "by [the] rules," took advantage of people, lacked empathy for others and felt no remorse for harm that he had caused.

The record is replete with examples cited by Zeman in support of his conclusions regarding the defendant's aggressive and violent proclivities and lack of empathy or remorse for his actions. For example, Zeman, in rendering his opinion regarding the defendant's mental condition, relied on information provided to him by Hoskins, the defendant's ex-wife, friends and others[30] that the defendant: (1) constantly engaged in fights in both grade school and high school; (2) punched walls, broke doors and smashed furniture in his home; (3) placed his hands around Hoskins' neck and attempted to choke her after having sex with her during a conjugal visit in 1994, so frightening her that she never returned for any more such visits; (4) showed little or no remorse for killing the victim either immediately after the killing or thereafter; (5) told his wife that the victim "deserved what she got"; and (6) gave his wife the victim's necklace. These examples provided ample evidence to support Zeman's conclusion regarding the defendant's aggressive and violent proclivities and lack of remorse for his actions.

---

[30] To the extent that this information was provided to Zeman by third parties, the jury was instructed that it could consider the information solely for the purpose of assessing the credibility of Zeman's conclusions, and not for the truth of the matters asserted.

Additionally, Hoskins' testimony not only supported Zeman's conclusions, but also provided independent evidence of the defendant's aggressiveness, violence and lack of remorse for the killing. Hoskins testified that the defendant had: threatened to harm physically his two year old stepson, who suffered from a severe neurological abnormality; threatened his wife's brother with a hammer; tried to attack an elderly female driver after her car had struck the defendant's car, causing only minor property damage; attacked another motorist with a tire iron after a car accident; pushed and grabbed his wife during arguments with her; pulled a female friend off a sofa by her feet in anger; and sought to have sex with his wife immediately upon returning home after the killing.

Furthermore, although the defendant claimed that the victim willingly engaged in sexual relations with him, the defendant's numerous conflicting statements to the police and to psychiatric experts strongly suggested that his version of the pertinent events was not credible.[31] For example, in his confession to the police, the defendant indicated that he had consensual sexual intercourse with the victim on one occasion the night of the killing, on the campus of the University of Connecticut at Storrs. The defendant told Borden, one of the psychiatric experts, however, that he twice had engaged in sexual intercourse with the victim on that evening, once on campus, and a second time while parked in his car on Hop River Road.

The defendant also provided conflicting information regarding the extent of his intoxication on the night of

---

[31] Of course, the jury was not free to infer the opposite of what the defendant asserted in his statements based solely on its disbelief of those assertions. See, e.g., *State* v. *Hart*, 221 Conn. 595, 604, 605 A.2d 1366 (1992). Because those statements provided the only direct evidence tending to establish that his sexual relations with the victim were consensual, however, the credibility of those statements was critical to the jury's determination of that issue.

the killing. At the time of his arrest, the defendant told the police that he had consumed two shots of whiskey and six beers that night. Thereafter, the defendant told psychiatric experts that he had consumed one-half gallon of whiskey, a case of beer and some gin between 10:30 a.m. and 7:30 p.m. on the day of the homicide, and that he also had been using cocaine and marijuana during that time period. Hoskins testified, however, that the defendant did not appear to be intoxicated when he left for the bowling alley around 7:30 p.m., and a friend of the defendant, who saw him at the bowling alley, also indicated that the defendant did not appear to be intoxicated. Furthermore, none of the several persons who had come into contact with the defendant shortly after the victim's death thought that he appeared to be under the influence of alcohol or drugs.

In addition, the information the defendant provided regarding the victim's alleged use of alcohol and drugs lacked credibility. For example, in his statement to the police, the defendant asserted that he and the victim had smoked marijuana together, but he did not indicate that the victim had consumed any alcohol while they were together. Thereafter, the defendant told one of the psychiatric experts that the victim had supplied the marijuana that they had smoked together, that she had asked him to drive around because "she was not in any condition to go home" and that she wanted him to procure some "heavy duty" drugs for her. The defendant further stated that, as he and the victim drove around, the victim had consumed alcohol from two bottles that were in her purse. Harakaly and Roy testified, however, that the victim had no drugs in her possession and no alcohol in her purse other than the small amount of vodka that the three of them had shared earlier in the evening. See footnote 4 of this opinion. The testimony given by Harakaly and Roy was corroborated by toxicol-

ogy tests, which indicated that the victim had only a small amount of alcohol in her blood.

Finally, the defendant provided inconsistent versions of his immediate response to the victim's alleged attack on him. Specifically, in his confession to the police, he stated that, when the victim first came after him, he seized the knife away from her and started to stab her. The defendant told one of the psychiatric experts, however, that he initially resisted the victim's assaultive advance by pushing her away and knocking her to the ground; he claimed that he began to stab her only after she resisted his efforts to help her up by kicking him. Furthermore, Katsnelson, the associate medical examiner, provided uncontroverted testimony that the hand wounds suffered by the defendant during the altercation likely were not defensive injuries and, therefore, inconsistent with the defendant's claim that the victim was the initial attacker and that he had suffered a cut to his hand in trying to disarm her.[32]

[32] In support of his claim, the defendant also notes that the trial court had excluded certain motive testimony that the state had sought to introduce into evidence. Specifically, the state, earlier in the trial, sought to present the testimony of Tardif, an acquaintance of the defendant, concerning a comment that the defendant had made to Tardif following a brief encounter that the defendant had had with the victim at a shopping mall in Willimantic a couple of weeks prior to her death. In particular, Tardif testified, during the state's offer of proof outside the presence of the jury, that the defendant, after speaking with the victim at the mall, had told Tardif that "[h]e wanted to fuck [the victim's] brains out." The defendant objected to Tardif's testimony as irrelevant and unduly prejudicial. The state responded that the statement was probative of the "defendant's attitude toward the victim" and of his "preexisting plan or at least [his] desire to have sexual relations with the victim." The state argued that Tardif's testimony tended to rebut the defendant's claim, as he articulated in his confession to police, that his sexual encounter with the victim was consensual. The trial court excluded the proffered testimony, concluding that the prejudicial effect of the such evidence outweighed its probative value and, furthermore, that the evidence adduced up to that point in the trial did not support an inference that the defendant had forced the victim to have sex with him. The defendant claims that this ruling is inconsistent with the court's subsequent determination that the state's argument to the jury regarding motive was supported by the evidence and, therefore, was proper. We disagree.

In light of all of the foregoing, we conclude that the jury reasonably could have determined, despite the defendant's contrary assertions, that the victim did not willingly have sexual intercourse with him shortly before he killed her. Concededly, the evidence of a sexual assault was not overwhelming. Indeed, the prosecutor, herself, acknowledged in her closing argument to the jury that "we can't prove conclusively . . . that she was sexually assaulted" and "[w]e will never truly know why the defendant killed [the victim] . . . ." The

Subsequent to the state's offer of proof with respect to Tardif's testimony, the state adduced substantial evidence of the defendant's violent and aggressive propensities and his lack of remorse. As we have summarized in part II of this opinion, Zeman testified extensively about the defendant's proclivities for violence and aggression, citing numerous examples of such conduct. In addition, Hoskins testified about several incidents of violence by the defendant. Furthermore, the evidence suggested that the defendant's confession was not truthful in several key respects, including the number of times that he had engaged in sexual intercourse with the victim. When considered with the other evidence admitted at trial, the foregoing evidence—all of which was adduced by the state *after* the trial court's exclusion of Tardif's testimony—supported the court's subsequent determination, rendered in connection with its denial of the defendant's motions for a mistrial and a new trial on grounds of prosecutorial misconduct, that from "all the evidence . . . [the jury] can reasonably infer that a sexual assault took place."

We note, finally, that the dissenter in this case relies on a second evidentiary ruling to support her conclusion that the trial court abused its discretion in denying the defendant's motions for a mistrial and a new trial. Specifically, the dissenter points out that the trial court, in its limiting instruction regarding Borden's testimony about the defendant's statement to Veilleux that Hop River Road would be a good place to "rape you, kill you, leave you, and . . . no one would ever find you," informed the jury that it was not to consider that testimony for substantive purposes because "the defendant has not been charged with rape." The dissenter asserts that this instruction also is inconsistent with the court's subsequent ruling rejecting the defendant's motions for a mistrial and a new trial. This contention is without merit. The state acknowledged that Borden's hearsay testimony regarding the defendant's statement to Veilleux was admissible only to evaluate the basis for Borden's opinion and not to prove the truth of the matter asserted in the statement. Indeed, the state also sought the limiting instruction that the trial court had given to the jury regarding Borden's testimony about the defendant's statement. Consequently, that instruction bears no relation to the defendant's claim regarding the propriety of the prosecutor's closing argument.

defendant, however, was not charged with sexual assault and, therefore, the state was not required to prove such conduct beyond a reasonable doubt. The issue, rather, is whether the prosecutor's theory of motive was plausible given the relevant facts and circumstances. Viewed in the light most favorable to the state, we are persuaded that the evidence supported an inference that the victim did not willingly agree to engage in sexual intercourse with the defendant. We, therefore, reject the defendant's claim that the trial court improperly rejected the defendant's motions for a mistrial and a new trial based on prosecutorial misconduct.

## III

The defendant also claims that he is entitled to a new trial in light of the trial court's jury instruction that "[t]he law is made to protect society and innocent persons and not to protect guilty ones." Specifically, the defendant contends that this instruction undermined the presumption of innocence, thereby diluting the state's burden of proof in violation of his fifth amendment right to due process and his sixth amendment right to a jury trial.[33]

The defendant concedes that this claim is foreclosed by our recent decision in State v. Schiappa, 248 Conn. 132, 168–73, 728 A.2d 466, cert. denied, 728 U.S. 466, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999), in which we rejected an identical argument.[34] The defendant, how-

---

[33] Although the defendant did not object to this language at trial, the record is adequate for our review of the defendant's constitutional claim. See State v. Golding, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

[34] Although we rejected the defendant's constitutional claim in Schiappa; State v. Schiappa, supra, 248 Conn. 177; we nevertheless directed our trial courts to refrain from any future use of the challenged language in recognition of the fact that, "[b]ecause the guilty as well as the innocent are entitled to the protections afforded by the presumption of innocence and the reasonable doubt standard, the . . . charge, when viewed in isolation, gives rise to a danger of juror misunderstanding." Id., 175. The trial of this case occurred prior to the issuance of our decision in Schiappa.

ever, requests that we reconsider and overrule *Schiappa*. Absent a persuasive reason to do so, we decline the defendant's invitation. Consequently, the defendant's claim of instructional impropriety must fail.

The judgment is affirmed.

In this opinion NORCOTT, SULLIVAN and CALLAHAN, Js., concurred.

KATZ, J., dissenting. I agree with the majority's well reasoned analysis and resolution of the defendant's first and third issues on appeal. I disagree, however, with the majority's treatment of the claim of prosecutorial misconduct.

The defendant in the present case, David L. Copas, claims that the prosecutorial misconduct during the state's closing argument to the jury was so egregious that it deprived him of his right to a fair trial under the due process clause of both the state and federal constitutions.[1] I agree with the defendant and would grant him a new trial.

Our jurisprudence addressed to claims of prosecutorial misconduct is well settled. A state's attorney "is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the State, who seek impartial justice for the guilty as much as for the innocent. In discharging his most important duties, he deserves and receives in peculiar degree the support of the court and the respect of the citizens of the county. By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or

---

[1] Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

liberty are at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused be guilty, he should none the less be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe." *State* v. *Ferrone*, 96 Conn. 160, 168–69, 113 A. 452 (1921).

In fulfilling his duties, a prosecutor must confine the arguments to the evidence in the record. See *State* v. *Binet*, 192 Conn. 618, 631, 473 A.2d 1200 (1984). Statements as to facts that have not been proven amount to unsworn testimony that is not the subject of proper closing argument. A.B.A., Standards for Criminal Justice, Prosecution Function and the Defense Function (3d Ed. 1993), standard 3-5.8 (a) and commentary, pp. 106–107. "While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury have no right to consider." *State* v. *Ferrone*, supra, 96 Conn. 169.

The defendant claims that the state's attorney's interjection of sexual assault, for which there was no supporting evidence, as a motive for the homicide amounted to prosecutorial misconduct, calculated to appeal impermissibly to the emotions, passions and prejudices of the jurors. Assessing this claim against the record of the state's unsuccessful repeated attempts to introduce evidence of the defendant's alleged forced sexual relations with the victim as the reason for the homicide, I agree with the defendant's characterization.

During its case-in-chief, the state attempted to introduce the testimony of Phillip Tardif, the defendant's friend, describing the defendant's comments to him

upon first meeting the victim. The defendant allegedly told Tardif that he wanted to "f--- [the victim's] brains out." The state argued that the evidence was relevant because it "tends to show some motive on the part of the defendant, and also I think [it] goes to . . . whether or not in fact that intercourse was in fact consensual on that occasion. I'm not saying its conclusive on the issue of motive. I'm saying it tends to show motive on the part of the defendant." In its decision sustaining the defendant's objection to the state's introduction of Tardif's testimony, the trial court remarked, "I don't see where that ties in with the murder, and it's a long stretch, particularly in view of [Arkady Katsnelson, the state's medical examiner's] statement that there was no violence involved . . . . [T]here is no evidence of nonconsensual [intercourse] because of what Doctor Katsnelson said." When the state's attorney argued that sexual assault could have been committed by the threat of force and not necessarily by the use of force, the court responded: "Just a minute. I understand that, but you're asking—you would be asking the jury to draw an inference that because a knife was there the confession says that she pulled out the knife first. You can believe or disbelieve that, but I don't see where there is any evidence on which to draw an inference that the knife was used to threaten or force a sexual act. . . . I don't see any evidence of [the threat of force] here, and I think the fact that to draw that inference is not all that probative and not all that accurate to give the jury the possibility of drawing an inference which I think is much more prejudicial than it is probative so I'm going to sustain the objection."

Thereafter, following the testimony of Walter Borden, a psychiatrist, that the defendant had committed the homicide in a reactive rage to a perceived threat by the victim, the state, over the defendant's objection, elicited testimony from Borden regarding a conversation he

had had with Michelle Veilleux, one of the defendant's roommates at the time of the homicide. According to Borden, Veilleux had told him that, one week prior to the homicide, the defendant, while together with her and Tardif on Hop River Road in Coventry, near the scene of the homicide, had remarked that that location would be a good place to rape and kill someone because the body would never be discovered. The trial court gave a limiting instruction immediately thereafter cautioning the jury that this evidence could be used solely to rebut Borden's testimony that the defendant had committed the homicide in a reactive rage and that he had had no preconceived thoughts to kill. As part of this instruction, the trial court cautioned, "[i]n particular, you should disregard the statement about rape because in this case, the defendant has not been charged with rape."[2]

Despite the aforementioned instances in which the trial court clearly notified the state that insufficient evidence had been presented from which a jury could reasonably conclude that a sexual assault had occurred, the state's attorney, in its initial argument to the jury, deliberately injected the notion of forced sexual relations into the specter for consideration as a motive for the killing.

The state's attorney made the following pertinent remarks: "Now a word about motive. In a criminal case, the state is only required to prove the elements of the crime, and we are not required to prove what the defendant's motive is or was. The existence of motive, how-

---

[2] When questioned about evidence of a forced sexual assault, Borden testified that he found no signs of trauma to indicate a rape. The victim's body was fully clothed when discovered. Additionally, the autopsy did not disclose any physical evidence to suggest a forced sexual assault. Katsnelson, the state's medical examiner, testified that his findings of prostatic fluid in the victim's vagina were consistent with sexual intercourse. Her genitals revealed no evidence of violent penetration, or, indeed, any trauma.

ever, can go toward showing the defendant's intent, and the absence of motive may also go to a lack of intent.

"Motive, however, like intent is a mental process and can only be discerned in two ways. Number one would be to look again into the defendant's mind, which, of course, we can't do, and secondly would be to look at his actions. We will never truly know why the defendant killed [the victim], but I can suggest to you that there are two very probable motives here.

*"Number one is that the defendant sexually assaulted [the victim] and either then killed her to cover up his act or killed her because she threatened to report him to the police, to his wife, or to her boyfriend.*

"We can't prove conclusively . . . that she was sexually assaulted. Only two people know that, and only one is here to tell us. [The victim] is not here to tell us her version. Just because the defendant has claimed through his confession that the sex was consensual here doesn't make it so. We know that somebody can be sexually assaulted without the use of force. The threat of force or of overpowering someone can constitute a sexual assault." (Emphasis added.)

The defendant moved for a mistrial immediately thereafter arguing that the state had intentionally invited the jury to speculate that he had sexually assaulted the victim and then killed her perhaps because she had threatened to notify the police. Although the defendant had told the police that he and the victim had had consensual sexual relations, which the jury was free to believe or disbelieve, the defendant contended that the state's attorney improperly argued the opposite and thereby hypothesized a threat of force as well as a threat of disclosure. See *Builders Service Corp., Inc.* v. *Planning & Zoning Commission*, 208 Conn. 267, 292–93, 545 A.2d 530 (1988) (although court did not credit uncontradicted expert opinion testimony,

"it is not entitled . . . to conclude that the opposite is true, especially where there is no evidence to justify that conclusion"); see also *Anderson* v. *Anderson*, 191 Conn. 46, 56, 463 A.2d 578 (1983); *Novak* v. *Anderson*, 178 Conn. 506, 508, 423 A.2d 147 (1979); *Martino* v. *Grace-New Haven Community Hospital*, 146 Conn. 735, 736, 148 A.2d 259 (1959). Merely from the disbelief of one party's testimony, a trier of fact cannot infer that an opposing party's allegation, unsupported by any evidence, is correct. *State* v. *Alfonso*, 195 Conn. 624, 634, 490 A.2d 75 (1985) (" '[w]hile it is true that it is within the province of the jury to accept or reject a defendant's testimony, a jury in rejecting such testimony cannot conclude that the opposite is true' "); see also *Edwards* v. *Grace Hospital Society*, 130 Conn. 568, 575, 36 A.2d 273 (1944); *Walkinshaw* v. *O'Brien*, 130 Conn. 151, 153, 32 A.2d 639 (1943).

Despite its earlier decision that there was no evidence from which the jury reasonably could have inferred that the defendant had killed the victim because he had sexually assaulted her, the trial court denied the motion for a mistrial. The trial court characterized the state's argument as follows: "The state's attorney was merely pointing out that the only evidence that [the sex] was consensual was from the defendant and point[s] out why the defendant is not believable, so that leaves one other alternative, that it was possibly a sexual assault. I think that is a reasonable inference that the jury can draw from the evidence that is there." The trial court essentially permitted the jury to infer that, if it were to determine that the defendant's statement was not credible, the opposite was likely to have been true. That is precisely what our case law prohibits. See *Builders Service Corp., Inc.* v. *Planning & Zoning Commission*, supra, 208 Conn. 292–93, and cases cited therein.

I am not persuaded by the majority's conclusion that the prosecutor did nothing more than argue permissible

inferences from the evidence. On the contrary, I agree with the defendant's assertion that the state's attorney's remarks inviting the jury to consider the defendant's alleged sexual assault improperly injected into the deliberative process abhorrent conduct based solely upon rank speculation. See *United States* v. *Vaglica*, 720 F.2d 388, 395 (5th Cir. 1983) (improper to "suggest to the jury that inadmissible evidence exists that bears against the defendant's case"); *United States* v. *Narciso*, 446 F. Sup. 252, 321–22 (E.D. Mich. 1977) (prosecutor's complaint to jury that " '[t]he Government hasn't even been allowed to present [certain] evidence' . . . implied strongly that evidence of the defendants' guilt existed which was not presented"); *People* v. *Emerson*, 97 Ill. 2d 487, 497, 455 N.E.2d 41 (1983) (improper "to suggest that evidence of guilt existed which, because of [the] defendant's objection, cannot be brought before the jury"); 88 C.J.S. 354–55 and nn. 56–58, Trial § 181 (a) (1955) ("improper for counsel to argue or comment on excluded evidence, or to express regret that the court should have excluded certain evidence from the jury, or state that the excluded evidence was admissible").

I recognize that the state did not have to prove the alleged motive that the victim was sexually assaulted beyond a reasonable doubt. *State* v. *Joyce*, 243 Conn. 282, 299, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998). I further appreciate that "[i]n a civil case, proof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the material fact." (Internal quotation marks omitted.) *Service Road Corp.* v. *Quinn*, 241 Conn. 630, 641, 698 A.2d 258 (1997).

To allow a permissible inference, however, requires a reasonable belief in the probability of the existence of the material fact. When the correlation between the predicate facts and the conclusion is slight, then the inference is less reasonable, and "[a]t some point, the link between the facts and the conclusion becomes so tenuous that we call it 'speculation.' When that point is reached is, frankly, a matter of judgment." *Goldhirsh Group, Inc.* v. *Alpert*, 107 F.3d 105, 108 (2d Cir. 1997).

As the majority aptly describes the evidence, we see the defendant as a man, who, on several occasions, exhibited aggressive behavior and violence, who showed little or no remorse for the killing, and who suffered from an antisocial and narcissistic personality disorder marked by aggressiveness, repeated assaults and physical cruelty. Additionally, the defendant provided conflicting statements to the police and the psychiatric experts regarding the number of times he and the victim had engaged in sexual relations, his responses to the victim's alleged attack on him, and the extent of his intoxication, as well as her alleged use of alcohol and drugs. Finally, the jury heard evidence that the victim was a young girl who exhibited extreme reluctance to ride with the defendant on the night in question.

"If the evidence would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury." (Internal quotation marks omitted.) *DiDomizio* v. *Frankel*, 44 Conn. App. 597, 600, 691 A.2d 594 (1997). In this case, at two separate points, the trial court clearly notified the state that insufficient evidence had been presented from which a jury could reasonably conclude that a sexual assault had occurred. Essentially, the trial court determined, as a matter of judgment, that the link between the facts and the conclusion was so tenuous as to constitute

speculation. See *Goldhirsh Group, Inc.* v. *Alpert,* supra, 107 F.3d 108.

I recognize that the trial court's determinations were made in the context of two evidentiary rulings and that nothing in those rulings *directly* addressed whether the state had established any other evidence, either directly or circumstantially, of the alleged sexual assault. There was, however, nothing else offered by the state, following the trial court's statement that insufficient evidence had been presented from which a jury could reasonably conclude that a sexual assault had occurred, that created a reasonable belief in its probability. The defendant's prior acts of violence and evidence of his cruel nature were relevant only because of the defense of extreme emotional disturbance, and the jury's disbelief in the defendant's version of the events surrounding the homicide did not justify an inference that the state's allegation to the contrary is true. As I previously have indicated, although the trial court denied the defendant's motion for a mistrial, having determined that there was a basis for allowing the jury to infer a sexual assault, that assessment was impermissibly rooted.

I believe that the state's attorney presented an argument that was clearly calculated both to defeat the defendant's defense of extreme emotional disturbance and to furnish the cruel and calculated rationale for what was clearly a senseless and vicious attack. His remarks were intended to evoke even greater sympathy for the victim by suggesting that prior to the killing the defendant had terrorized the victim into succumbing to unwanted sexual relations. "We have stated that such appeals should be avoided because they have the effect of diverting the jury's attention from their duty to decide cases on the evidence. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant fac-

tors which are likely to skew that appraisal." (Citations omitted; internal quotation marks omitted.) *State* v. *Williams*, 204 Conn. 523, 545–46, 529 A.2d 653 (1987).

"A demonstrated deliberate effort by a prosecutor to influence the jury against the defendant through the attempted introduction of obviously inadmissible evidence may entitle the defendant to a new trial." *State* v. *Baker*, 182 Conn. 52, 58, 437 A.2d 843 (1980). In analyzing the defendant's claim, the issue is whether the prosecutor's conduct " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden* v. *Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986), quoting *Donnelly* v. *DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974); see *State* v. *Hawthorne*, 176 Conn. 367, 372, 407 A.2d 1001 (1978).

We do not focus alone, however, on the conduct of the prosecutor. " 'The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct.' " *State* v. *Palmer*, 196 Conn. 157, 163, 491 A.2d 1075 (1985), quoting *State* v. *Ubaldi*, 190 Conn. 559, 562, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983); see *Darden* v. *Wainwright*, supra, 477 U.S. 180–81; *State* v. *Doehrer*, 200 Conn. 642, 654, 513 A.2d 58 (1986).

"In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. *State* v. *Williams*, [supra, 204 Conn. 540]. Among those factors we include are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . .

the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Aponte*, 249 Conn. 735, 746–47, 738 A.2d 117 (1999).

I treat these factors accordingly. First, there is no doubt that the defendant did not invite the comments by the state's attorney. Second, the state's argument was made despite the trial court's earlier decision that there was insufficient evidence that a sexual assault had taken place. Third, the notion that the defendant killed the victim to conceal the sexual assault was devastating to his defense that he had killed the victim in a reactive rage and without premeditation or forethought. Whether they had consensual sexual relations was critical to this defense. Fourth, the trial court provided no curative relief. The cautionary remarks to the jury that it was the finder of the facts and that the arguments of counsel did not constitute evidence were not directed specifically to the state's theory of motive.[3] Finally, the evidence, although overwhelming as to the killing, was not so irrepressible or compelling on the issue of intent—the only issue in the case—as to render the state's transgression harmless.

Accordingly, I respectfully dissent.

---

[3] Rather than caution the jury to disregard the state's argument, the trial court instructed the jury that it was at liberty to consider motive evidence, and did not differentiate between the motive to conceal a sexual assault and the motive to steal. The defendant did not request a curative instruction because the trial court, in denying the defendant's motion for a mistrial, concluded that the state's comment had been proper.